WRIGHT FARMS CONSTRUCTION, INC.

v.

**Juanita KREPS, Secretary of Commerce.**

**Civ. A. No. 77–260.**

United States District Court,
D. Vermont.

Dec. 23, 1977.

Fred I. Parker, Langrock, Sperry, Parker and Stahl, Middlebury, Vt., for plaintiff.

Gerald S. Hartman, Civ. Rights Div., Dept. of Justice, Washington, D.C., for defendant.

## OPINION

COFFRIN, District Judge.

 Plaintiff brings this action for injunctive relief to restrain defendant Secretary of Commerce from enforcing in the future 42 U.S.C. § 6705(f)(2), the minority business enterprise (MBE) provision of the Local Public Works Capital Development and Investment Act of 1976 (LPW Act), as amended by the Public Works Employment Act of 1977 (PWE Act).[1] We find jurisdiction on the basis of 28 U.S.C. § 1331(a). Plaintiff's motion for a temporary restraining order was denied on November 25, 1977, for failure to show irreparable injury. Arguments and testimony on plaintiff's application for a preliminary and permanent injunction were heard together on December 12, 1977, pursuant to Fed.R.Civ.P. 65(a)(2).[2] At that time defendant had not filed an answer to the complaint but the issues were defined and clearly understood by the parties so that the matter was in posture for ultimate determination. Defendant's motion to dismiss for failure to join an indispensible party was heard on December 12 as well.

---

1. The LPW Act was enacted as Pub.L. 94–369, 90 Stat. 999–1012, and was codified at 42 U.S.C. § 6701 *et seq.* The PWE Act, Pub.L. 95–28, 91 Stat. 116–121 (May 13, 1977), amended certain provisions of the LPW Act. For the sake of clarity, this opinion refers only to sections as they appear in 42 U.S.C.

2. The defendant argued strenuously in its memoranda and at the December 12 hearing that a preliminary injunction should not issue because plaintiff has failed to show the necessary elements for such relief under *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250 (2d Cir. 1973), namely either probable success on the merits and possible irreparable injury, or sufficiently serious questions on the merits to be fair ground for litigation and a balance of hardship tipping decidedly toward the party requesting the preliminary relief.

The defendant would have us add two additional requirements for a preliminary injunction of lack of harm to the public interest and lack of harm to third parties. We doubt those elements are part of the preliminary injunction standard of the Second Circuit but this we need not decide because here we are not considering the propriety of issuing a preliminary injunction, but rather a permanent injunction. We cannot fail to permanently enjoin the enforcement of a statutory provision if it has been found to be unconstitutional as applied to the situation before the court even if to do so will effect some harm to some of the public or to third parties.

Some of the defendant's concerns regarding irreparable injury are considered in the textual section on standing.

██ Plaintiff is a small construction corporation wholly owned by two caucasians which challenges the MBE provision on the grounds that it violates plaintiff's equal protection rights under the fifth amendment of the United States Constitution [3] and violates 42 U.S.C. §§ 6727 (the civil rights section of the LPW Act) and 2000d (Title VI of the Civil Rights Act of 1964).

Defendant Secretary of Commerce argues that the MBE provision is minority-sensitive legislation designed to correct the effects of prior discrimination and therefore does not violate plaintiff's rights under either the fifth amendment or the civil rights sections.

We find that even if the MBE provision does not generally violate the United States Constitution or the pertinent civil rights sections of 42 U.S.C., the provision cannot be applied in cases such as the one before us. To do so would give preferential treatment to some persons on the basis of race without a finding of prior discrimination against those or similarly situated persons, and thus would deny plaintiff its equal protection rights under the fifth amendment.

*Standing*

 Although neither party has specifically raised the question of standing, we consider this issue first because of the defendant's argument at the December 12 hearing that the plaintiff has failed to show any irreparable injury. The defendant bases her argument on the fact that plaintiff failed to show it will be awarded any contract even if it is allowed to bid. The plaintiff argues in opposition that the significant factor is not that it will be awarded a contract but that it has been prevented from bidding.

The plaintiff has presented uncontroverted evidence that but for the MBE provision, it would have received contracts for street improvement projects in Hardwick and Essex Jct., Vermont. Although plaintiff seeks only prospective injunctive relief, this evidence is nevertheless important as an indication of plaintiff's competitive standing on street improvement projects in the state. Fifty to eighty percent of the plaintiff's work is performed for municipalities and the vast majority, if not all, current municipal projects requiring curb and sidewalk work are funded under the provisions of the LPW and PWE Acts. At the present time, plaintiff has been able to contract for much less work than it customarily has obtained by this time of year. In addition, we note that the plaintiff has been in existence only since 1973 and has had an annual gross income of less than $60,000 for every year except 1977 when the gross income is approximately $110,000. In 1976, the gross income from plaintiff's business of its two owners was $7,800.

We believe that it is reasonable to assume that the plaintiff will obtain a contract for at least one of the projects remaining open for bid, and that without this suit, the plaintiff's constitutional claims of denial of equal protection under the fifth amendment will not be heard and decided. Because the plaintiff has a personal stake in the outcome of the litigation, *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and because it is attempting to assert rights which a federal court will recognize, we find it has standing to sue.[4] *Norwalk Core v. Norwalk Redevel. Agency*, 395 F.2d 920, 927 (2d Cir. 1968).

*Motion to Dismiss*

 Plaintiff elected to bring its action solely against Juanita Kreps, Secretary of

---

**3.** We note that although the fifth amendment does not contain an equal protection clause *per se*, its due process clause incorporates the equal protection element prohibiting racial discrimination to the same extent as the equal protection clause contained in the fourteenth amendment prohibits such discrimination. *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

**4.** It is clear from the case law that corporations are "persons" for purposes of claiming a denial of fourteenth amendment rights. *See, e. g., Santa Clara County v. Southern Pac. R. R.*, 118 U.S. 394, 396, 6 S.Ct. 1132, 30 L.Ed. 118 (1886). Because plaintiff's claim is essentially an equal protection claim, we find the plaintiff has standing to sue for a denial of fifth amendment due process rights.

Commerce. On the day of trial, defendant moved pursuant to Fed.R.Civ.P. 12(b)(7) for the dismissal of the action for failure to join local grantees under the act (e. g., the municipalities or counties receiving funds), and prime and subcontractors who might wish to bid on projects funded under the act. Defendant argues that these are indispensible parties under Fed.R.Civ.P. 19(a) since their interests would be adversely affected by such injunctive relief as the court might ultimately grant.

Rule 19 contemplates that a person subject to service of process and whose joinder will not deprive the court of jurisdiction shall be joined as an additional party if the person either has an interest in the action which should be protected or is a party without whose presence complete relief cannot be afforded to those who are already parties to the action. *See* 3A *Moore's Federal Practice* ¶ 19.07–1[3], at 2254–55 (2d ed. 1977). Obviously joinder, not dismissal for failure to join, is the proper way to proceed if possible in the circumstances. Nevertheless, an action might have to be dismissed upon motion if the proposed party is indispensible to determination of the matter and joinder is not feasible. Such a motion may be made at the time of trial. Fed.R.Civ.P. 12(h)(2). Under the circumstances of this matter, however, we conclude for reasons stated below that there are no parties in addition to the defendant who are indispensible to a determination of the plaintiff's claim.

An indispensible party is one who must be joined because nonjoinder prejudices his rights and those of the parties already joined such that the action cannot continue without him. *Jones Knitting Corp. v. A. M. Pullen & Co.,* 50 F.R.D. 311, 314 (S.D.N.Y.1970); *see also Hill & Range*

*Songs, Inc. v. Fred Rose Music, Inc.,* 58 F.R.D. 185 (S.D.N.Y.1972); *Bond v. Harris,* 239 F.Supp. 427 (S.D.N.Y.1964); *Grace v. Carroll,* 219 F.Supp. 270 (S.D.N.Y.1963).

In the case at hand, Count 1 of the complaint alleges that § 6705(f)(2) discriminates against the plaintiff on the basis of race and national origin and violates plaintiff's equal protection rights under the fifth amendment of the United States Constitution. Specifically, it alleges that bids for sidewalk and curb construction submitted by it as a subcontractor have been rejected by the general contractor on local public works projects funded under the PWE Act because if accepted the general contractor would be unable to meet the MBE requirement of the act. Plaintiff also alleges that bids which it might wish to submit on future projects will be rejected by the general contractor for the same reason. Plaintiff's prayer for relief is not specific and asks only that the defendant be restrained from enforcing § 6705(f)(2). At the trial plaintiff made clear that it was asking for prospective relief limited to itself and to those projects which had not been bid at the time of trial. Essentially plaintiff seeks both not to be denied the right, because it is not an MBE, to bid on future jobs funded under the PWE Act, and not to be prevented for the same reason from being awarded contracts on those projects on which it might be the low bidder.

Thus it is clear that the plaintiff seeks rather narrow relief. Prospective bidders, largely unknown until the bidding takes place,[5] would not be prevented from bidding nor from having their bids accepted if they were the low bidders. It is equally manifest that there is no necessity for the requested relief to affect in any way the

---

5. At the time of the hearing on plaintiff's application for a temporary restraining order, the plaintiff was apprehensive that the MBE provision would prevent it from making a meaningful bid on a project for the City of Burlington scheduled for bids in the then near future. Plaintiff was unable to bid on the project because the court did not issue a temporary restraining order. In fact, two of the general contractors to whom plaintiff intended to submit a bid because they had requested plans and specifications from the City, did not bid. The remaining and successful bidder was itself a sidewalk contractor and for that reason was not interested in subcontracting the sidewalk and curbing portion of the project. It was impossible for the plaintiff to determine in advance not only whether it would have received the contract but even which prime contractors would actually bid on the project.

grant of PWE funds for public works projects which already have been approved.[6]

▮ Furthermore, whether an absent party is indispensible is a question which must be decided in the practical context of each particular case. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); *see also Kaplan v. International Alliance of Theatrical Stage Emps. and Motion Picture Mach. Operators of U. S. and Canada*, 525 F.2d 1354 (9th Cir. 1975); *Lynch v. Sperry Rand Corp.*, 62 F.R.D. 78 (S.D.N.Y.1973). In this regard we must consider, if not give compelling weight to, the time constraints which arise because of the unusual haste with which Congress requires the provisions of the PWE Act to be implemented. The act was enacted May 13, 1977. Within the next four and one-half months, the Economic Development Administration (EDA) was required to promulgate regulations and to process applications for the expenditure of four billion dollars. Pub.L. 95–29 (May 13, 1977). To make certain the act was implemented as rapidly as possible, 42 U.S.C. § 6707(h)(1) provides that unless otherwise indicated, the Secretary of Commerce acting through EDA was not to consider, or approve, or make a grant for any project for which the application was not submitted on Round I of the public works program. Finally, § 6705(d) provides that grantees are required to commence on-site construction within 90 days of project approval.

By the time the plaintiff was able to assess the effect of what it perceived to be an unconstitutional application of the MBE provision, the seven and one-half months[7] allowed EDA by Congress to fully implement the act was nearly at an end. Had the situation developed earlier or were there more time in which to consider the related rights of grantees and other contractors, it might be or have been desirable to join those peripherally interested in the implementation of the act as it affects the plaintiff, but by the time the consequences became apparent, plaintiff's plight was acute.

For these reasons, defendant's motion to dismiss the complaint for failure to join indispensible parties is denied.

### MBE Cases in Other Jurisdictions

Several other courts have considered, at various stages of applications before them for temporary restraining orders and injunctions, similar challenges to the constitutionality of the MBE provision. Three have essentially upheld the constitutionality of the provision;[8] one has struck it down as violating the equal protection rights of contractors.[9] Three others have denied applications for a preliminary injunction or a temporary restraining order without reaching the merits of the plaintiffs' claims.[10]

6. See *Severability, infra.*

7. The figure of 7½ months is arrived at by adding the 90 days to begin construction onto the 4½ months between when the PWE Act was enacted and the September 30, 1977 deadline for all grant approvals.

8. *General Bldg. Contractors Ass'n v. Kreps*, No. 77–3682 (E.D.Pa., opinion from bench Dec. 9, 1977) (preliminary injunction denied); *Ohio Contractors Ass'n v. EDA*, No. C–1–77–619 (S.D.Ohio, filed Nov. 22, 1977) (preliminary injunction denied); *Contractors Ass'n of W. Pa. v. Kreps*, Civ. No. 77–1035 (W.D.Pa., dated Oct. 13, 1977) (preliminary injunction denied), *appeal filed*, No. 77–2335 (3d Cir. Oct. 17, 1977).

9. *Associated Gen. Contractors of Cal. v. Secretary of Commerce*, 441 F.Supp. 955 (C.D.Cal. 1977) (issued permanent injunction and declaratory relief on summary judgment motion holding the MBE statute and rules and regulations issued thereunder unconstitutional and illegal under the fifth amendment, and Title VI of the Civil Rights Act of 1964, particularly 42 U.S.C. §§ 2000d and 2000d–1; the injunction does not apply to any funds already granted).

10. *Montana Contractors' Ass'n v. Secretary of Commerce*, 439 F.Supp. 1331 (D.Mont. 1977) (preliminary injunction denied); *Associated Gen. Contractors of Wyo. v. Secretary of Commerce*, No. C77–222 (D.Wyo., dated Nov. 4, 1977) (temporary restraining order denied); *Florida E. Coast Chapter of the Ass'd Gen. Contractors of America*, No. 77–8351–Civ–JR (S.D.Fla., filed Nov. 3, 1977) (preliminary injunction denied).

*The MBE Provision*

Several of the opinions from other courts have outlined the LPW and PWE Acts in considerable detail.[11] Consequently, we will discuss those acts only briefly and focus on the MBE provision and various regulations and guidelines promulgated thereunder.

The LPW Act was enacted to stimulate the economy and increase employment by providing for the expeditious construction of public works. Under this act, two billion dollars were appropriated in what became known as "Round I" of the public works program. Subsequently, Congress enacted the PWE Act which amended certain provisions of the LPW Act and provided for an additional four billion dollars for Round II. Pub.L. 95–29, Chap. III (May 13, 1977).

> Section 6705(f)(2) of 42 U.S.C. requires:
> Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises.

A minority business enterprise (MBE) is defined as

> a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.

*Id.*

Unfortunately there is extremely little legislative history dealing with the MBE provision. It was introduced from the floor during debate on the PWE Act and was intended to increase the participation of minority businesses in the construction industry because they have a difficult time competing in that industry as evidenced by the fact that only one percent of all government contracts are given to minority businesses, 123 Cong.Rec. H1436–37 (daily ed. Feb. 24, 1977) (remarks of Rep. Mitchell); *see also* 123 Cong.Rec. S3910 (daily ed. Mar. 10, 1977) (remarks of Sen. Brooke), even though 17 percent of the population of the United States is of minority races. *Contractors Ass'n of W. Pa. v. Kreps*, Civ. No. 77–1035, at D–7 (W.D.Pa., dated Oct. 13, 1977). Apparently the provision was first introduced as an amendment to the act on the floor of the House of Representatives on February 24, 1977 by Representative Mitchell of Maryland. 123 Cong.Rec. H1436 (daily ed. Feb. 24, 1977). He explained that "all this amendment attempts to do is to provide that those who are in minority businesses get a fair share of the action from this public works legislation." *Id.* Mitchell was questioned by several representatives regarding the applicability of the provision in those areas of the country where there are "no minority contractors" or "no minorities." He consistently reassured the House that "SOP administrative law . . . says this kind of amendment would not apply where there are no minority contractors or where there are no minorities" and that grantees would not have to import minority contractors and businesses from another state in order to comply with the MBE provision. *Id.* at H1438; *see also* pages H1437, 1439. Mitchell's amendment was agreed to as amended by use of the preface "Except to the extent that the Secretary determines otherwise, . . . .." The preface was to clarify that where it "is not possible to comply with [the provision], because different regions in the country do not have minorities concentrated in the construction trades . . . it would not apply." *Id.* at H1438 (remarks of Rep. Roe who proposed the prefatory amendment to Mitchell's amendment).

A similar MBE provision was introduced in the Senate on March 10, 1977 by Senator Brooke of Massachusetts. 123 Cong.Reg. S3909 (daily ed. Mar. 10, 1977). That version contained a second clause as follows:

---

**11.** In particular, see the opinions cited notes 8 and 9, *supra*.

This section shall not be interpreted to defund projects with less than 10 percent minority participation in areas with minority population of less than 5 percent. In that event, the correct level of minority participation will be predetermined by the Secretary in consultation with EDA and based upon its lists of qualified minority contractors and its solicitation of competitive bids from all minority firms on those lists.

In his opening remarks, Brooke discussed possible concern about the impact of his proposed amendment on areas where "there are few minorities." He explained that the amendment "is designed to facilitate greater equality in contracting. This amendment provides a *rule-of-thumb* . . .." *Id.* at S3910 (emphasis added). Senator Durkin of New Hampshire stated, "I just want to get it clearly set forth in the record that in a State such as New Hampshire, where we have a very small minority population as minority is defined in the amendment or in the bill, our people would not be forced to go out of the State to find minority contractors at the expense of small business people in the State of New Hampshire." *Id.* at S3910. Brooke assured him that that was correct, and referred him to the second half of his amendment. There was no further discussion, and the amendment was agreed to by the Senate. *Id.*

Senator Brooke's second clause was not contained in the final version of the MBE provision; the conference adopted the House version. House Conf. Rep. No. 95–230, 95th Cong., 1st Sess., at 11 (1977), U.S.Code Cong. & Admin.News 1977, p. 168. Just prior to the House agreeing to the Conference Report, Representative Roe explained that "[t]he conferees agreed that [the MBE] provision would be dependent on the availability of minority business enter-

prises in the applicant's jurisdiction." 123 Cong.Rec. H3934 (daily ed. May 3, 1977); *accord*, House Conf. Rep. No. 95–230, 95th Cong., 1st Sess., at 11 (1977).

 Thus, despite the paucity of legislative history, it is clear that Congress intended for § 6705(f)(2) to provide a relatively small benefit to minority business enterprises without creating extreme hardship for grantees and non-MBE's in areas with small minority populations.[12]

After the bill was passed by both houses and signed by the President, the Secretary of Commerce promulgated, pursuant to 42 U.S.C. § 6706, regulations and guidelines necessary to carry out the MBE provision. Section 317.19(b) of 13 C.F.R., 42 Fed.Reg. 27434–35 (May 27, 1977) provides:

(b) *Minority business enterprise.* (1) No grant shall be made under this part for any project unless at least ten percent of the amount of such grant will be expended for contracts with and/or supplies from minority business enterprises.

(2) The restriction contained in paragraph (1) of this subsection will not apply to any grant for which the Assistant Secretary makes a determination that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area determined in relation to the nature of the services or supplies intended to be procured.[13]

These regulations were issued and became effective without prior notice and hearing in accordance with § 553(a)(2) of the Administrative Procedure Act, 5 U.S.C. § 553(a)(2).

The Secretary also published "Guidelines for Round II of the Local Public Works Program" (June 6, 1977); "Guidelines for 10% Minority Business Participation in

---

**12.** During the legislative debates, several persons referred to areas of the country with "no" minority populations. However, according to the Fifty-one State Advisory Committees' report to the U.S. Commission on Civil Rights, *The Unfinished Business Twenty Years Later* . . . (Sept. 1977), no state has *no* minority population as minority is defined by § 6705. Maine, New Hampshire and Vermont have the lowest percentages of minority populations with less than 1.5 percent in each state.

**13.** No challenge has been made, and we need not consider, the propriety of the "reasonable trade area" designation in the regulations when the understanding in both the House and Senate was that MBE's would not have to be drawn from outside the grantee's state.

LPW Grants" (undated) (hereinafter 10% Guidelines); and a related "Technical Bulletin" (Oct. 11, 1977).[14] The June 6 Guidelines merely set out the MBE requirement and the procedure for requesting a total or partial waiver of the requirement. The 10% Guidelines gives much more information about the EDA's approach to the provision. That approach is, essentially, that EDA "will enforce the 10% MBE participation requirement strictly," 10% Guidelines at 1, and that "a Grantee situated in an area where the minority population is very small may apply for a waiver before requesting bids on its project or projects if it can show that there are *no* relevant, available, qualified minority business enterprises which could reasonably be expected to furnish services or supply materials for the project." *Id.* at 15 (emphasis added). Thus it appears that the EDA will not grant a waiver where there is at least one available MBE.

### Reverse Discrimination

The primary question before us is: When does preferential treatment become illegal reverse discrimination? As the Fifth Circuit pointed out in *Weber v. Kaiser Aluminum & Chem. Corp.*, 563 F.2d 216, 219 (5th Cir. 1977), "[t]he answer depends on the law involved, the nature of the affirmative action, and the factual circumstances of the prior discrimination." *See also Green v. County School Bd. of New Kent County*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968) ("There is no universal answer to complex problems of [school] desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance.")

To date, there are no decisions by the Supreme Court or federal courts of appeals on whether the MBE provision is legal preferential treatment or illegal reverse discrimination. However, we have found the cases concerning racial quotas and affirmative action in other areas to be helpful in analyzing the constitutionality of the preferential treatment accorded by the MBE provision.

At the outset, we should state that we agree with the Fifth Circuit that the distinction between numerical goals and quotas is illusory.[15] *Weber*, at 222. While the former allows for somewhat less distinct lines to be drawn than the latter, the effect of both is to grant benefits to a given percentage or percentage range of persons in one class of people with the necessary effect of denying those benefits to the same number of persons in another class. In the case before us, the classes are drawn according to race or, in the case of Spanish-speaking persons, cultural background.

There are many areas in which federal courts have been called upon to determine the constitutionality of racial quotas. At the present time the United States Supreme Court is considering the case of *Bakke v. Regents of the Univ. of Cal.*, 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), *cert. granted,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977) (argued Oct. 12, 1977), which challenges the use of affirmative action plans in admitting people to state-operated professional graduate schools. A comparable plan was challenged in *DeFunis v. Odegaard*, 82 Wash.2d 11, 507 P.2d 1169 (1973), where the Washington Supreme Court held that such an admissions policy does not violate the United States Constitution. A petition for certiorari was granted by the United States Supreme Court, but the case was subsequently vacated as moot. 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). *See also Alevy v. Downstate Medical Center*, 39 N.Y.2d

---

**14.** As far as we have been able to determine, these pamphlets are available only through EDA.

**15.** The opinion in *Rios v. Enterprise Ass'n Steamfitters Local 638,* 501 F.2d 622 (2d Cir. 1974), uses "goal" rather than "quota" because "the term 'quota' implies a permanence not associated with 'goal.'" *Id.* at 628 n. 3. While we believe the question of permanence may be important in a discussion of racial quotas, we do not mean to imply any greater permanence by the use of "quota" rather than "goal."

326, 384 N.Y.S.2d 82, 348 N.E.2d 537 (1976) (found reverse discrimination is constitutional in proper circumstances, but the court did not consider the circumstances before it because plaintiff failed to show he would have been admitted absent racial preference).

The Supreme Court has considered the use of racial ratios [16] to achieve desegregation. In *United States v. Montgomery County Bd. of Educ.*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969), the Court reinstated the district court's fixed mathematical ratios for desegregation of the faculty and staff of a public school because the ratios were more specific and expeditious than the appellate court's more flexible ratios. Subsequently, "racial balances or racial quotas" were used to desegregate schools where a dual school system had been maintained by school authorities in the recent past and where the authorities had not come forward with an acceptable desegregation plan. The Court held that because the lower court's use of mathematical ratios "was no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement," its use was within the court's "equitable remedial discretion." *Swann v. Charlotte Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).

Federal courts have considered many cases concerning affirmative action programs in the area of employment. Al-though the Supreme Court has not yet specifically considered quotas in employment, the following three cases do provide insight into the requirements for conferring benefits on members of one race which work as detriments to members of another. The first two cases concern seniority systems; the third, a qualifying exam.

In *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the Supreme Court held that under the "make whole" objective of Title VII, 42 U.S.C. §§ 2000e–2000e–17 (discussed in more detail *infra*), federal courts could order seniority status retroactive to the dates of the employment applications of identified victims of racial discrimination which violated the statute.[17] The Court found "untenable the conclusion that this form of relief may be denied merely because the interests of other employees may thereby be affected." *Id.* at 775, 96 S.Ct. at 1269. That analysis, the Court said, would prevent correcting the wrongs to which the statute is directed.

Subsequently, in *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court held that "an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." *Id.* at 353–54, 97 S.Ct. at 1864. Like the Court in *Franks*, the *Teamsters* Court never discussed the equal protection implications in

---

**16.** The term "ratio" is used to indicate either that the work force is to have a certain ratio of minorities to nonminorities, or to indicate that hiring and promotion are to be awarded to one class of people in a fixed ratio to another class. For example, under the desegregation plan in *Montgomery County, infra*, in schools with 12 or more teachers, the race of at least one out of every six faculty and staff members was required to be different from the race of the majority of faculty and staff members. Similarly, in many Title VII plans, *infra*, unions or employers are required to add, for example, one black for every two whites who join or are hired.

**17.** The Court had previously held that federal programs which eliminate "built-in headwinds" to minority employment are valid even though there is no evidence of discriminatory intent.

*Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (arbitrary criteria for employment which invidiously discriminates against minorities prohibited). The Court also held in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* at 421, 95 S.Ct. at 2373. (footnote omitted). Both of these cases came up under Title VII and benefitted minorities at no expense to nonminorities. The Court did not discuss the applicability of the equal protection elements of the fifth amendment in either case.

the suit before it; it handled the case solely in terms of statutory construction. The Court ordered the district court on remand to identify the victims of racial discrimination and to determine their "rightful place." Then the district court would be "faced with the delicate task of adjusting the remedial interests of discriminatees and the legitimate expectations of other employees innocent of any wrongdoing." *Id.* at 372, 97 S.Ct. at 1873. The Supreme Court stated:

> Although not directly controlled by the Act, the extent to which the legitimate expectations of nonvictim employees should determine when victims are restored to their rightful place is limited by basic principles of equity. In devising and implementing remedies under Title VII, no less than in formulating any equitable decree, a court must draw on the "qualities of mercy and practicality [that] have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." . . . Especially when immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent parties, the courts must "look to the practical realities and necessities inescapably involved in reconciling competing interests," in order to determine the "special blend of what is necessary, what is fair, and what is workable."

*Id.* at 374–75, 97 S.Ct. at 1874 (footnote and citations omitted).

■ In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court discussed equal protection and racial discrimination in the context of a challenge to a qualifying test for police officers which was failed by a disproportionately large group of black applicants. The Court upheld the test because it was "neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue," *id.* at 246, 96 S.Ct. at 2051, namely to determine minimum reading and writing skills for police officers. The rational basis test

was applied because a law, neutral on its face, is not subjected to strict scrutiny merely because there is a disproportionate impact on different races; strict scrutiny is triggered when there is evidence that the government action reflects a racially discriminatory purpose. *Id.* at 239, 242, 96 S.Ct. 2040.

The vast majority of circuit court cases concerning quotas under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, have approved the imposition of quotas as remedies for past discrimination. Section 703 of Title VII, 42 U.S.C. § 2000e–2, defines various unlawful employment practices by employers, employment agencies, labor organizations and training programs. The enforcement provisions of the act entitle courts which find a respondent has intentionally engaged in or is engaging in an unlawful employment practice to enjoin the action or to order "such affirmative action as may be appropriate . . . ." 42 U.S.C. § 2000e–5(g). Since 1972, quotas or "goals" have been imposed in the following cases: *United States v. International Union of Elevator Constructors, Local 5*, 538 F.2d 1012 (3d Cir. 1976) (black union membership goal and black referral quota); *EEOC v. Local 638 . . . Local 28 of Sheet Metal Workers' Int'l Ass'n*, 532 F.2d 821 (2d Cir. 1976) (upheld membership goal but struck down order to replace a nonminority union representative with a minority under the requirement of *Kirkland, infra,* that the effect of reverse discrimination not be concentrated upon a small, ascertainable group); *Boston Chapter, N.A.A.C.P. v. Beecher*, 504 F.2d 1017 (1st Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975) (argument that color conscious relief of priority pooling of minorities is unconstitutional is without merit because the "relief goes no further than to eliminate the lingering effects of previous practices . . . ." *Id.* at 1027); *Rios v. Enterprise Ass'n Steamfitters Local 638*, 501 F.2d 622 (2d Cir. 1974) (racial goal for hiring upheld under *Wood, Wire, infra,* and *Vulcan Society, infra* ) (Hays, J., dissenting,

would hold the goals violate Title VII); *United States v. Masonry Contractors Ass'n*, 497 F.2d 871 (6th Cir. 1974) (hiring quota); *United States v. N.L. Indus., Inc.*, 479 F.2d 354 (8th Cir. 1973) (hiring ratio and plant-wide seniority); *United States v. Local 212 Int'l Bhd. of Elec. Workers*, 472 F.2d 634 (6th Cir. 1973) (union membership quota not prohibited by 5th and 14th amendments). *See also EEOC v. Detroit Edison Co.*, 515 F.2d 301 (6th Cir. 1975) (approved plant-wide seniority; affirmative action may include the imposition of hiring quotas), *cert. granted*, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977) (judgment vacated and remanded for consideration of *Teamsters, supra*); *Patterson v. Newspaper and Mail Deliverers' Union*, 514 F.2d 767 (2d Cir. 1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976) (approved settlement agreement with minority hiring goal and a hiring ratio); *United States v. Wood, Wire and Metal Lathers Int'l Union, Local 46*, 471 F.2d 408 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973) (approval of consent decree requiring union to immediately issue 100 work permits to minority applicants; "quotas merely to attain racial balance are forbidden, quotas to correct past discriminatory practices are not." *Id.* at 413).

Similarly, several circuit courts have upheld judicially imposed racial quotas in the area of employment under the Civil Rights Act, 42 U.S.C. §§ 1981, 1983, when there has been a finding of racial discrimination. Title VII was not at issue in these cases. *Boston Chapter, N.A.A.C.P. v. Beecher, supra*, 504 F.2d 1017 (1st Cir. 1974); *N.A.A.C.P. v. Allen*, 493 F.2d 614 (5th Cir. 1974) ("drastic remedy of quota hiring" approved, *id.* at 621; "It is the collective interest, governmental as well as social, in effectively ending unconstitutional racial discrimination, that justifies temporary, carefully circumscribed resort to racial criteria . . . [as] the only rational, nonarbitrary means of eradicating past evils." *Id.* at 619); *Erie Human Relations Comm'n v. Tullio*, 493 F.2d 371 (3d Cir. 1974) (hiring quota); *Morrow v. Crisler*, 491 F.2d 1053 (5th Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) (en banc) (remand to district court to order temporary affirmative hiring relief); *Vulcan Soc'y of New York City Fire Dept. v. Civil Service Comm'n*, 490 F.2d 387 (2d Cir. 1973) (allowed interim quota system for hiring from eligibility lists); *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Comm'n*, 482 F.2d 1333 (2d Cir. 1973) (quota remedy justified for hiring but not for ranks above patrolman because there was no finding that the promotional examination was not job related); *Commonwealth of Pa. v. O'Neill*, 473 F.2d 1029 (3d Cir. 1973) (en banc) (per curiam) (appeal from preliminary injunction; hiring ratios upheld by equally divided court; promotion ratios unanimously struck down); *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972) (hiring ratios); *Carter v. Gallagher*, 452 F.2d 315, 330–31 (8th Cir.) (en banc), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) (approved a reasonable ratio for minority persons for a limited period of time or until there is a fair approximation of minority representation consistent with the population mix in the area).

Racial quotas have also been upheld when incorporated in plans to implement equal employment opportunities in federally funded construction. *Southern Ill. Builders Ass'n v. Ogilvie*, 471 F.2d 680 (7th Cir. 1972) (*Ogilvie* plan; the requirement of affirmative action imports more than the negative obligation not to discriminate); *Contractors Ass'n of E. Pa. v. Secretary of Labor*, 442 F.2d 159 (3d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971) (*Philadelphia* plan); *Joyce v. McCrane*, 320 F.Supp. 1284 (D.N.J. 1970) (Newark plan). *See also Associated Gen. Contractors of Mass. v. Altshuler*, 490 F.2d 9 (1st Cir. 1973), *cert. denied*, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974) (state funded construction project).

Despite what appears to be an overwhelming acceptance of the use of minority quotas, a few appellate panels have refused to order such relief. In *Weber v. Kaiser Aluminum & Chem. Corp.*, 563 F.2d 216 (5th Cir. 1977), the Fifth Circuit found that the

employer had not been guilty of any discriminatory hiring or promotion at the plant involved in the case. The court held that "[i]n the absence of prior discrimination a racial quota loses its character as an equitable *remedy* and must be banned as an unlawful racial *preference* prohibited by Title VII, § 703(a) and (d)." *Id.* at 224 (emphasis in original). The court used the familiar "rightful place" analysis and refused to allow preferential treatment to correct past societal discrimination.[18] In *Harper v. Kloster*, 486 F.2d 1134 (4th Cir. 1973), the court rejected racial hiring quotas because effective relief could be granted without resort to quotas. *Id.* at 1136 (adopting the lower court's discussion in *Harper v. Mayor and City Council of Baltimore*, 359 F.Supp. 1187, 1213–15 (D.Md. 1973)). *See also Commonwealth of Pa. v. O'Neill, supra*, 473 F.2d 1029 (3d Cir. 1973) (en banc) (per curiam) (appeal from preliminary injunction; court struck down promotion ratios because the trial court admitted that there was no evidence concerning the statistical significance of the data on which its finding was based); *Parham v. Southwestern Bell Tel. Co.*, 433 F.2d 421, 429 (8th Cir. 1970) (denied injunc-

tion to enjoin company from violating Title VII because the company's record over previous three years was "impressive and salutory"; district court to retain jurisdiction).

Finally, the Second Circuit in *Kirkland v. New York State Dept. of Correct'l Servs.*, 520 F.2d 420 (2d Cir. 1975), *cert. denied*, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), considered the imposition of racial quotas in the context of promotion quotas for civil service positions. The court noted that the "replacement of individual rights and opportunities by a system of statistical classifications based on race is repugnant to the basic concepts of a democratic society" and that the Second Circuit "has approached the use of quotas in a limited and 'gingerly' fashion." *Id.* at 427. The circuit court reversed the lower court's decision to the extent that it imposed a permanent quota restriction upon those who seek to be promoted by court-approved job-related civil service examinations. Reversal was necessary because under the facts before the court, a permanent quota would grant benefits on grounds "wholly unrelated to the consequences of any alleged past discrimi-

**18.** The *Weber* court cites three cases for the proposition that "[t]hree circuits have refused to approve racial quotas when the factual circumstances of the past or present discrimination did not dictate such an extraordinary remedy." 563 F.2d at 221. Strictly speaking those are not quota cases, but rather constructive seniority cases. *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1976) (Title VII and § 1981; transfers under company seniority limited to employees who previously suffered discrimination in the transfers); *Watkins v. United Steel Workers, Local 2369*, 516 F.2d 41, 44–45 (5th Cir. 1975) (when present hiring practices are, and for 10 years have been, nondiscriminatory, a long-established seniority system for lay-offs and recall, adopted without intent to discriminate, does not violate Title VII or § 1981).

In *Chance v. Board of Examiners*, 534 F.2d 993 (2d Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977), the panel originally denied constructive seniority to persons hired under an affirmative action plan. Judge Oakes wrote a vigorous dissent to the majority opinion arguing that it was within the district court's discretion to find that constructive seniority was necessary to protect the integrity of the court's remedial plan to increase minority hiring. He cautioned that the "focus of our concern should be upon whether there is

an accurate method of redressing past discrimination in such a way as to benefit those who have been discriminated against only at the expense, if at all, of those who gained undue advantage by the discrimination." *Id.* at 1003. On rehearing after *Franks v. Bowman Transport Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), constructive seniority was afforded to those persons who took and failed the discriminatory exam *and* to those persons who failed to apply to take the exam because they reasonably believed the exam to be discriminatory and unrelated to job performance. 534 F.2d at 1007. Like the Supreme Court in *Franks*, the appellate court did not discuss constitutional issues. Nevertheless, the original panel decision is important here because it presumed that affirmative action could not be instituted unless it was to counter the effects of past discrimination. "If a minority worker has been kept from his rightful place . . . he may, in some instances, be entitled to preferential treatment—not because he is Black, *but because, and only to the extent that,* he has been discriminated against." *Id.* at 999 (emphasis added). That presumption was not disturbed by the opinion on rehearing which modified only so much of the prior decree as related to one class of persons. *Id.* at 1007.

nation" and therefore would constitute "court-imposed reverse discrimination without any exceptional or compelling governmental purpose." *Id.* at 430. A subsequent Second Circuit case interpreted *Kirkland* as promulgating a two-fold test for the imposition of *temporary* quotas: (1) a " 'clearcut pattern of long-continued and egregious racial discrimination' " and (2) the effect of the reverse discrimination must not be "concentrated upon a relatively small, ascertainable group of non-minority persons." *EEOC v. Local 638 . . . Local 28 of Sheet Metal Workers' Int'l Ass'n, supra,* 532 F.2d 821, 828 (2d Cir. 1976).

To summarize, the federal courts to date which have considered racial quotas have upheld them to achieve school desegregation or equal employment opportunity when there has been a specific finding of prior racial discrimination. The few appellate panels which have refused to require quotas have done so because there was no racial discrimination to remedy or no need to resort to a racial quota. Although the cases did not arise under the equal protection elements of the due process clause of the fifth amendment, we believe the same requirements must be met under that clause before reverse discrimination in the form of a racial quota can be imposed.

■ One final element that must be considered in determining the propriety of a racial quota is the effect of the quota on the attitudes of this nation's citizens towards persons of the benefitted race. As Justice Brennan pointed out in his opinion concurring in part in *United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 173–74, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), concerning voting redistricting,

> even in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race consciousness . . . .. Furthermore, even preferential treatment may act to stigmatize its recipient groups, for although intended to correct

systemic or institutional inequities, such a policy may imply to some the recipients' inferiority and especial need for protection. . . .

\* \* \* \* \* \*

> [E]ven a benign policy of assignment by race is viewed as unjust by many in our society, especially by those individuals who are adversely affected by a given classification.

*Accord, DeFunis v. Odegaard, supra,* 416 U.S. 312, 343, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (Douglas, J., dissenting); *Associated Gen. Contractors of Mass. v. Altshuler,* 490 F.2d 9, 17 (1st Cir. 1973), *cert. denied,* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974) ("Government recognition and sanction of racial classifications may be inherently divisive, reinforcing prejudices, confirming perceived differences between the races, and weakening the government's educative role on behalf of equality and neutrality."); *Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Comm'n,* 482 F.2d 1333, 1341 (2d Cir. 1973). The problem of reinforcing or even creating racial prejudices is particularly acute in a state like Vermont where the minority population is very small and racial discrimination relatively unknown so that preferential treatment appears to be totally unfair and unjust.

■ We conclude from the above cases and our own analysis of the issues involved that reverse discrimination granting preferential treatment by imposing a racial quota can be upheld only when it operates to benefit a minority that has been or is being harmed by racial discrimination. The use of quotas is constitutional only to the extent that it is remedial.

*Power of Congress*

■ This court must also consider the fact that the MBE provision is not a judicial remedy for a judicially determined wrong; it is an enactment of Congress.[19] The de-

---

19. "To the extent 'legislative facts' are relevant to a judicial determination, Congress is well equipped to investigate them, and such determinations are of course entitled to due respect." *Katzenbach v. Morgan,* 384 U.S. 641, 668, 86 S.Ct. 1717, 1731, 1736, 16 L.Ed.2d 828

fendant makes much of the argument, and this court does not deny, that Congress has broad power through the enforcement clauses to remedy the effects of prior discrimination. For two reasons that argument is not dispositive of the issues in this case.

First, that argument goes to the constitutionality of the MBE provision on its face not to its constitutionality as applied in the situation which gave rise to this case. Because we find that the statute is unconstitutional as applied to the facts of this case, we need not decide whether or not it is constitutional on its face. Similarly we need not decide who or how the finding of racial discrimination which can justify reverse discrimination is to be made, because we find no such finding has been made by

Congress[20] and we specifically find that there has been no discrimination against minorities, as that term is defined in the PWE Act, in the State of Vermont.[21]

In each case we have found or to which we have been cited involving minority-sensitive remedial legislation, there is one or more of the following factors distinguishing the case from the one before this court. (1) The legislation involved was passed to protect or secure a fundamental interest for the minority members.[22] (2) In evolving the legislation Congress made extensive findings that past discrimination against the minority members had existed.[23] (3) There was no showing that the legislation had a reverse discriminatory effect that denied nonminority members a legitimate right.[24] We have been cited to other cases

(1966) (Harlan, J., dissenting) (footnote omitted). A declaration of congressional belief is "of course entitled to the most respectful consideration, coming as it does from a concurrent branch . . . ." *Id.* at 669–70, 86 S.Ct. at 1737.

**20.** Title II of the PWE Act does set out congressional findings and declarations, but none of them relate to the MBE provision.

**21.** See *Application of the MBE Provision, infra.*

**22.** See *United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (right to vote as secured by fourteenth and fifteenth amendments); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (right to be free from badge of slavery as provided by thirteenth amendment); *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (rights to vote and to share in governmental services as provided by fourteenth amendment); *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (right to vote secured by fifteenth amendment).

**23.** See *Jones v. Alfred H. Mayer Co., supra; Katzenbach v. Morgan, supra; South Carolina v. Katzenbach, supra.* In *United Jewish Organizations, supra,* the Court upheld the challenged Voting Rights Act, the enactment of which was based on extensive findings of prior discrimination. See *South Carolina v. Katzenbach, supra.* We note also that though the Voting Rights Act does not require a positive finding of prior discrimination before racial criteria can be used to formulate redistricting plans, any state that becomes subject to the

Voting Rights Act does have the opportunity to show that it has not determined the composition of the electorate using certain methods that in effect disfranchise racial minorities. New York State sought exemption from the application of the Voting Rights Act but was unable to make an adequate showing of nondiscrimination. See 430 U.S. at 148–49, 97 S.Ct. 996.

**24.** See *Jones v. Alfred H. Mayer Co., supra; Katzenbach v. Morgan, supra; South Carolina v. Katzenbach, supra.* In *United Jewish Organization, supra,* the petitioner claimed that the Hasidic Jewish community was in effect disfranchised because it had been divided in two by new voting districts which were drawn to insure that those districts had a 65 percent nonwhite majority. That claim was not sufficiently substantiated to show unconstitutional discrimination against the petitioners. Four members of the Court pointed out that it is necessary that a redistricting plan not diminish racial voting strength, but the petitioners had not shown that minority voting strength had *increased* due to the plan's implementation and so had no constitutional claim. 430 U.S. at 162–63, 97 S.Ct. 996. Three members of the Court said of the plan: "[T]he State deliberately used race in a purposeful manner[, b]ut its plan represented no racial slur or stigma with respect to whites or any other race . . . ." *Id.* at 165, 97 S.Ct. at 1009. "Furthermore, the individual voter in the district with a nonwhite majority has no constitutional complaint merely because his candidate has lost out at the polls and his district is represented by a person for whom he did not vote. Some candidate, along with his supporters, always loses." *Id.* at 166, 97 S.Ct. at 1010. Finally, two Justices concurring in the judgment pointed out:

which have upheld affirmative action plans imposed by Executive Order, but substantially the same three factors also distinguish those cases from the one before this court.[25] In yet other cases dealing with the constitutionality of remedial legislation, the remedies were formulated after legislative findings of prior discrimination and did not discriminate on the basis of race.[26]

Second, we find that the minority-sensitive remedy here, the MBE provision, has been imposed in the circumstances of this case without the necessary finding that there existed prior discrimination that needed to be remedied. Congress did not have nor could it have had evidence before it of racial discrimination in the locale involved in this case. Indeed, this court finds that no such discrimination exists or existed. Nor did Congress provide a method whereby there would be a determination of prior discrimination or at least an opportunity to rebut a presumption of prior discrimination before the MBE provision was imposed here. It is clear that the MBE provision is not "the carefully conceived remedial scheme" such as that of the Voting Rights Act, which permits a balancing of unfairness to nonminorities against "the need for effective social policies promoting racial justice in a society beset by deep-rooted racial inequities." *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 175, 97 S.Ct. 996, 1014, 51 L.Ed.2d 229 (1977) (Brennan, J., concurring in part). A minority-sensitive remedy enacted by Congress that has a demonstrated adverse effect on nonminority members, that was imposed without a finding of prior discrimination or an opportunity to rebut a presumption of discrimination, and that was imposed in circumstances where it has been found there was no discrimination cannot withstand constitutional attack.

### Application of the MBE Provision to the Facts of this Case

Because there has been no legislative finding of discrimination in the construction industry in the State of Vermont, we must determine whether or not the imposition of a racial quota is constitutional when applied in the circumstances of this case. The standard of review when the government classifies persons according to race is strict scrutiny. As the Supreme Court said in 1944,

all legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitu-

---

The petitioners have made no showing that a racial criterion was used as a basis for denying them their right to vote, in contravention of the Fifteenth Amendment. . . .

 \* \* \* \* \* \*

[T]he record here does not support a finding that the redistricting plan undervalued the political power of white voters relative to their numbers in Kings County.

*Id.* at 179–80, 97 S.Ct. at 1017.

In *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Supreme Court did uphold the constitutionality of a statutory provision that gave Indians preference when being considered for jobs in the Bureau of Indian Affairs (BIA). Although the statutory provision involved there did discriminate against non-Indian employees, the holding of *Mancari* is not supportive of legislation which discriminates generally in favor of minorities and has an adverse effect on nonminorities. The Court noted that Indian tribes hold a "unique legal status . . . under federal law" and that Congress has "plenary power . . . to deal with the special problems of Indians . . . drawn both explicitly and implicitly from the

Constitution itself." 417 U.S. at 551–52, 94 S.Ct. at 2483. The Court then held that the legislative provision "is an employment criterion reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups. It is directed to participation by the governed in the governing agency." *Id.* at 554, 94 S.Ct. at 2484.

**25.** *See, e. g., Contractors Ass'n of E. Pa. v. Secretary of Labor*, 442 F.2d 159 (3d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), where before setting the minority hiring goals the Assistant Secretary of Labor found that there existed "exclusionary practices of labor organizations," *id.* at 163, and where the order also provided: "This commitment is not intended and shall not be used to discriminate against any qualified applicant or employee." *Id.* at 164.

**26.** *See, e. g., Califano v. Webster*, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977) (In a determination of social security benefits, males were treated differently from females.).

tional. It is to say that courts must subject them to the most rigid scrutiny. *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944) (upheld as within the war power of Congress and the Executive, exclusion of persons of Japanese ancestry from the west coast war area). *Accord, Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (struck down state miscegenation law). Ours is not a case like *Washington v. Davis, supra*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), where only the rational basis test should be applied, because here the government action clearly reflects a racially discriminatory purpose.

Turning to the facts of the case before us, we find that the 1970 census shows that there are 444,330 persons residing in Vermont. Three-tenths of one percent are not caucasians, and six-tenths of one percent are Spanish-speaking. The parties to this action have produced no evidence of discrimination against minorities within the State of Vermont. On the contrary, their evidence shows that the Spanish-speaking population has median and mean incomes which are approximately $2,000 per year greater than those of the general population of Vermont. This evidence is supported by the findings of the Fifty-One State Advisory Committees of the U.S. Commission on Civil Rights which states in its report, *The Unfinished Business Twenty Years Later* . . . (Sept. 1977), that the median income in Vermont of whites is $8,928, of blacks is $8,084, and of Hispanics is $10,053. The report also states that 9.1 percent of white families earn less than the federal poverty level while 8.6 percent of all black families earn at that level or lower. We find, therefore, that there has been essentially no discrimination in the State of Vermont against minorities as they are defined by the Public Works Employment Act, and that consequently conferring bene-

fits on those minorities on the basis of race or, in the case of Spanish-speaking persons, cultural background, violates the fifth amendment of the United States Constitution.

There remains the question of whether there are any persons who could benefit by the MBE provision who have been discriminated against in the past.[27] If the MBE provision can operate in Vermont to the benefit of minorities that have been discriminated against in Massachusetts or New York, for example, the application of the provision conceivably might not suffer the same constitutional infirmities raised by the case before us. As we outlined in our Interim Opinion and Final Order, filed December 14, 1977, street improvement projects require subcontractors for curbs and sidewalks, excavation, and pavement. Concrete for curbs and sidewalks can be poured only within a 40 mile radius of the concrete plant. Furthermore, there is no evidence, and the court doubts that there could be any evidence, that there are contractors capable of doing the required work who are from areas of past racial discrimination and are interested in bidding on the street improvement projects still open for bid in Vermont.

*Severability*

The only remaining question is whether or not the Secretary of Commerce can be enjoined from enforcing the MBE provision at the same time as she is enjoined from *failing* to provide a grant or to allocate funds under the Public Works Employment Act. In *Champlin Ref. Co. v. Corporation Comm'n of Okla.*, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932), the Supreme Court stated that the unconstitutionality of a part of an act does not defeat or affect the validity of the remaining provisions unless it is evident that the legislature would not have enacted those provisions

---

**27.** The evidence in this case shows that there is one MBE in Vermont, Winterset, Inc., engaged in curb and sidewalk work for municipalities and, just prior to the December 12 hearing, another MBE was formed to engage in the business of pouring concrete. The existence of those MBE's is not material to the analysis of this case because we have determined that reverse discrimination by imposing racial quotas can be upheld only if it is remedial, and that there is no racial discrimination to remedy in the State of Vermont.

which are within its power to enact independently of the provision which is not. *Id.* at 234, 52 S.Ct. 559. The Court has subsequently applied the same standard to an act which did not contain a clause expressly authorizing the severance of any invalid provision. *United States v. Jackson*, 390 U.S. 570, 585, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). Here there is no indication that Congress would not have enacted the Public Works Employment Act without the MBE provision. On the contrary, discussion of the provision was so slight, that we have no doubt that the act would have been enacted without special preferential treatment for minority contractors. Furthermore, here we do not go even as far as the Supreme Court cases because we do not hold that the MBE provision is unconstitutional. Therefore, we hold that enforcement of the MBE provision can be enjoined even while the remainder of the act must be complied with.

### Conclusion

For all the foregoing reasons, the court finds that the MBE provision, 42 U.S.C. § 6705(f)(2), is unconstitutional as applied to the facts of this case. This determination renders unnecessary a discussion of plaintiff's civil rights claims. The Secretary of Commerce is enjoined as set out in the Interim Opinion and Final Order, filed December 14, 1977.

Dated at Burlington in the District of Vermont, this 23rd day of December, 1977.

### INTERIM OPINION AND FINAL ORDER

Plaintiff in this action seeks to restrain the defendant Secretary of Commerce, Juanita Kreps, from enforcing 42 U.S.C. § 6705(f)(2) (the minority business enterprise, or MBE, provision) within the State of Vermont. Plaintiff's application for a temporary restraining order was heard on November 23, 1977 and denied November 25, 1977 on the ground that plaintiff had failed to show irreparable injury.

Plaintiff's motion for a preliminary injunction was heard on December 12, 1977.

In accordance with Rule 65(a)(2) of Fed.R. Civ.P., trial on the merits was advanced and heard at the same time.

The court having heard the testimony and the arguments of counsel, having examined the affidavits and exhibits filed, and having read the memoranda of law filed and the cases cited therein, hereby concludes that the MBE provision of Section 103 of the Public Works Employment Act of 1977, Pub.L. 95–28, enacted May 13, 1977, as it amends Section 106 of the Local Public Works Capital Development and Investment Act of 1976, 42 U.S.C. § 6705(f)(2), and the rules and regulations implementing Section 106(f)(2), are, and each of them is, in violation of the Constitution of the United States when applied in the circumstances of this case.

The evidence in the case disclosed that bids on several municipal street improvement projects under the Public Works Employment Act of 1977 are to be opened on December 15, 1977. The evidence also disclosed that, with one exception, the remaining bids under the Act are to be submitted prior to December 30, 1977. In view of the shortness of time and the certainty that without an order from this court the MBE provision will be implemented by the defendant with respect to those bids, the court issues this interim opinion and final order to be followed by a more definitive written opinion which will be filed hereafter with all possible dispatch.

For purposes of this interim opinion, the court finds as follows:

1. The MBE provision requires that 10 percent of the amount of each grant be given to a business enterprise, half of which is owned by Negro, Oriental, Indian, Eskimo, Aleut or Spanish-speaking persons.

2. From all the evidence before us, it appears that the MBE provision is not waived by the Economic Development Administration unless there is *no* minority business enterprise qualified to perform the services or supply the materials that are needed.

3. The 1970 census shows that there are 444,330 persons residing in Vermont. Three-tenths of one percent are not caucasians, and six-tenths of one percent are Spanish-speaking. Thus, less than one percent of the population is minority as that term is defined by the Public Works Employment Act.

4. There is no evidence before the court of any discrimination now or ever against any member of a minority in the State of Vermont. In fact, the Spanish-speaking population in the state has median and mean incomes which are approximately $2,000 per year greater than those of the general population of Vermont.

5. Street improvement projects require subcontractors for curbs and sidewalks, excavation and pavement. The redimix concrete required for curb and sidewalk work can be poured only within a 40 mile radius of the redimix plant. There is no evidence that there are MBE's doing excavation and pavement work from outside Vermont who have been or are interested in bidding on street improvement projects in Vermont.

6. The plaintiff corporation is not an MBE. It has been, and without this order would continue to be, prevented from bidding on, and therefore from receiving, contracts for curbs and sidewalks for municipalities receiving grants under the public works program. This denial of a meaningful right to bid has resulted in the loss to plaintiff of at least two contracts in the recent past and has put the plaintiff in the position of having much less work lined up for the next construction season than it normally has by this time of year.

The court holds that since there are no minorities who have *both* suffered discrimination at any time *and* could be benefitted by the MBE provision, and since the provision operates to the detriment of nonminority contractors, the provision violates plaintiff's equal protection rights under the fifth amendment of the United States Constitution. This conclusion is limited to the facts of this case and the court expresses no opinion as to the constitutionality of the application of Section 106(f)(2), as amended, to the facts of any other case.

The court has carefully considered defendant's claim that the injunctive relief which the plaintiff seeks is legally impermissible. We find, however, that the requested injunction is well within the general equity powers of the court. Furthermore, it might well be an abuse of discretion not to restrain the enforcement of a statutory provision which the court has specifically found to be unconstitutional as applied in the circumstances of the case. Mandamus has not been sought and is not applicable to the facts of this case. The defendant is neither being compelled to perform a ministerial act nor compelled to exercise her discretion. She is simply being restrained from implementing a section of a statute with its attendant rules and regulations which has been found to be unconstitutional when applied to the facts before us.

In this regard, the court specifically finds that Section 106(f)(2), 42 U.S.C. § 6705(f)(2), is functionally independent of the act of which it is a part and its elimination in no way alters the substantive reach of the statute but leaves its basic operation completely unchanged. *United States v. Jackson*, 390 U.S. 570, 586, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

It is hereby ORDERED, ADJUDGED AND DECREED as follows:

1. Defendant's Motion to Dismiss for failure to join an indispensible party is denied.

2. Section 106(f)(2) of the Local Public Works Capital Development and Investment Act of 1976, *as amended by* Public L. 95–28 § 103, 42 U.S.C. § 6705(f)(2), and the rules and regulations issued thereunder and relating thereto, are, and each of them is, unconstitutional as applied to the plaintiff in this action as under the facts of this case said section denies the equal protection of the law under the fifth amendment of the Constitution of the United States.

3. The defendant, Juanita Kreps, Secretary of Commerce, and her agents and delegates are permanently restrained and enjoined from enforcing, applying, carrying

out or implementing in any manner whatsoever, directly or indirectly, the provision of Section 106(f)(2), as amended, 42 U.S.C. § 6705(f)(2), and the rules and regulations issued thereunder against the plaintiff in this action. This injunction is prospective only and shall not be applied retroactively to any local public works projects within the State of Vermont which are being or have been funded entirely or in part under the provisions of Public Law 95–28 on which the plaintiff may have been eligible to bid and failed or was prevented from bidding for any reason whatsoever.

4. In particular, the defendant is restrained and enjoined from failing to provide a grant under Public Law 95–28 for any public works project within the State of Vermont involving the construction of curbs and sidewalks on which the plaintiff can bid from this date forward as a prime or subcontractor for the construction of said curbs and sidewalks solely because at least 10 percent of the amount of such grant will not be expended for minority business enterprises in accordance with the provisions of Section 106(f)(2), as amended. Further, the defendant is restrained and enjoined from failing to allocate, furnish or award the moneys available to fund such grant, to the extent that said defendant controls such funding, to a local public works project within the State of Vermont under Public Law 95–28 involving the construction of curbs and sidewalks on which the plaintiff can bid from this date forward as a prime or subcontractor for the construction of said curbs and sidewalks solely because at least 10 percent of the grant available for such local public works projects will not be expended for minority business enterprises in accordance with the provisions of Section 106(f)(2), as amended.