Margaret **DRAKE**, Individually and on behalf of all other persons of low income who want jobs and reside in public housing

v.

Hubert B. **CROUCH** et al.

Civ. A. No. 5911.

United States District Court,
M. D. Tennessee,
Nashville Division.

Sept. 23, 1971.

Rita Sanders Geier, Legal Services of Nashville, Inc., Nashville, Tenn., for plaintiff.

Joseph L. Lackey, Jr., Charles H. Anderson, U. S. Atty., Ames Davis, Asst. U. S. Atty., Nashville, Tenn., for defendants.

MEMORANDUM OPINION

MORTON, District Judge.

This is a suit for injunctive relief against defendants for alleged violations of 12 U.S.C. § 1701u and the regulations

of the United States Department of Housing and Urban Development.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, which provides for federal court jurisdiction of all civil actions arising under federal law wherein the matter in controversy exceeds $10,000; 28 U.S.C. § 1361, which provides for federal court jurisdiction of mandamus actions to compel an officer, employee or agent of the United States to perform a duty owed to the plaintiffs; 28 U.S.C. § 2201 et seq., which provides for.a declaratory judgment and other necessary relief; and 5 U.S.C. § 701 which provides for judicial review under the Administrative Procedures Act.

The plaintiffs assert their right to bring this action on their own behalf and on behalf of all other persons similarly situated pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. The plaintiffs reside in Nashville public housing; these housing projects have more than 4500 housing units. The identity of these individuals as proper representatives of this class of tenants is readily ascertainable from the records of the Nashville Housing Authority. The prerequisites of a class as set forth in Rule 23(a) and 23(b)(2) have, in this Court's opinion, been met. The Court determines this action to be maintainable as a class action as to such tenants in the 4500 housing units involved in this case.

## BACKGROUND

The Nashville Housing Authority is a non-profit organization formed under the provisions of T.C.A. 13–801 et seq. for the purpose of participating in a national housing program established by Congress. Beginning in the 1930's, the Nashville Housing Authority (hereinafter referred to as "NHA") erected public housing to provide living quarters for low-income families. This construction and the subsequent administrative operation of said housing was accomplished under the terms of a contractual arrangement with and under the supervision of the appropriate agency of the United States Government; this agency is now known as the Department of Housing and Urban Development (hereinafter referred to as "HUD"). After learning that the federal government had made available HUD funds for a modernization program of older housing units constructed prior to 1954 which had been owned and operated by local housing authorities, the NHA initiated a program to qualify for the federal monies in order to modernize its older housing units. The units selected by the housing authority for this program consisted of 5130 separate living spaces located in several different housing projects. To qualify for the funds, NHA was required to satisfy HUD's two-stage application procedure, i. e., the "initial submission" application and the "final submission" application. The initial submission application is intended to identify the required modernization work and the anticipated cost. After a joint review of the modernization needs and management policies and practices in the area by the local housing authority and HUD, the final submission, which incorporates the agreed-upon modernization program, is forwarded to HUD.

This suit arises due to the alleged failure on the part of NHA and HUD to comply with statutory requirements and regulations issued by HUD. The NHA, although it is a Tennessee corporation and has only a contractual arrangement with HUD, concedes that its contractual arrangement with HUD incorporates by inference the regulations established by HUD in the implementation of its statutory authority.

## CONTENTIONS OF PLAINTIFFS

Plaintiffs contend that there has not been compliance with:

(1) the tenant participation requirement; or

(2) the obligation to assure that tenants are hired and trained to do work under the modernization program.

## TENANT PARTICIPATION REQUIREMENT

HUD issued as a part of its administrative responsibilities a low-rent management manual and a modernization program handbook which provided that local authorities obtaining modernization funds would be expected to develop long- and short-range programs in the following areas:

(1) modernization and rehabilitation of buildings and grounds;

(2) involvement of tenants in the plans and programs for modernization of the project, changes in management policies and practices, and expanded services and facilities;

(3) expansion of community service programs and community facilities where needed to meet the requirements of the program;

(4) intensification of efforts to assist low-income families to realize their potential for economic advantage; and

(5) increased employment by local authorities of low-income tenants.

When discussions were initiated between NHA and HUD officials, HUD had not issued any additional regulations to implement the aforementioned objectives. At the time of the initial submission, at the time of the approval of the project, and to this date, HUD has not submitted any additional regulations.

In 1968 NHA inquired as to the availability of modernization funds. A preliminary inquiry was made of the tenants as to their preferences in the modernization of the housing facilities. In 1969, after some delay, the initial submission was made to the HUD organization in Atlanta. HUD conducted a field examination of the proposed modernization project in September, 1969, and issued a modernization review report. This report emphasized that HUD required a system of continued communication between the local housing authority and the tenants at each project. NHA was opposed to the concept of a formal tenant organization to effect a system of communication with the tenants. In discussing the attitude of NHA, HUD recommended that some system of project-wide communication be devised which would assure the local authority beyond question that its actions will be accepted by the majority of the tenants. Furthermore, HUD officials asserted that the chosen method of communication must also be adequate to insure that all tenants are kept fully informed of the reasons and justifications for policy actions which are not compatible with the expressed desires of the majority of the tenant body in the total community.

The NHA, in November, 1969, developed a policy which is summarized as follows:

"C. Administrative Policies and Practices

"1. Communication with Tenants

"a. Prepare a statement of policy establishing a method of continuing communication with all tenants which will evidence that optional policies and practices, and the items included for improvement in the Modernization Budget are acceptable to the majority of occupants.

*"It shall be the policy of the Authority to follow the practice of communicating with tenants on a personal basis starting (a) at the time an application is made for occupancy, and continuing (b) at the time a home visit is made prior to admission (c) at the time of the interview by the Housing Manager when the dwelling lease is executed; (d) through home visits by our Social Services Division; (e) through a cooperative exchange of information through the various social, health, and welfare agencies in the community who make visits to the families; (f) through the public and private agencies, such as settlement houses that provide various*

*social programs for the tenant families; (g) through annual reexaminations (h) through personal communications, such as letters, general information bulletins, etc.; (j) through our "open-door" policy whereby every tenant is encouraged to discuss problems, make suggestions and obtain information, etc.— through the Housing Manager, the Director of Housing, and the Executive Director; (k) where it is expedient to obtain an expression of the majority of the residency, the Authority shall hold a public hearing or an open meeting for the heads of families in their own respective project; (1) the Authority shall communicate with tenants through formal tenant organizations where it has been determined that the organization is representative of the tenants of a particular project or projects and are residents of public housing.*

*"The Authority shall continue to inform the tenants of the progress being made regarding the Modernization Program through one or more of the methods mentioned above."*

In October, 1969, the Nashville Tenants Organization was formed. This organization, a voluntary association, purported to represent groups from each public housing project with two representatives from each project being considered members. This group corresponded with NHA on February 26, 1970, seeking to be recognized as a bargaining agent for tenants of public housing in Nashville, Tennessee. Some of the language in the communication was as follows:

". . . without the participation of the tenants on an equal basis with management, the local housing authority is headed for rent strikes, increased vandalism, and bankruptcy."

". . . NHA must give up its special privileges . . . ."

". . . we demand that NHA recognize our organization as the representative of and the bargaining agent for the tenants of Nashville, public housing. We further demand that tenants and other poor people who are affected by NHA policies and practices be appointed to the NHA Board of Commissioners."

A survey instituted by NHA indicated that of the affected tenants in the modernization area, 54 of the tenants answered that they were represented by the Nashville Tenants Organization. A total of 4437 tenants answered that they were not so represented, and others made no reply to the questionnaire.

In the early part of 1970, NHA made another survey of its tenants, contacting more than 4500 units out of a total of 5130. HUD was furnished the information as to the results of the survey and the method in which it was conducted. In February, 1971, after extensive negotiations between NHA and HUD and a complete examination of the physical properties, HUD amended the annual contributions contract with NHA to provide funds to carry out Phase One of the modernization program. Phase One included, inter alia, replacement of roofing and heating systems, larger trash containers, upgrading electrical wiring for each unit, and replacing electrical distribution systems to provide outlets for air conditioning units.

Subsequently, NHA has submitted to HUD Phase Two of the modernization program, requesting and recommending additional modernization efforts supplementing those accomplished under Phase One. Phases One and Two provide for equipping the units with the items listed by the tenants in the two surveys conducted by NHA as being necessary or convenient. After the contractual arrangement of February, 1971, NHA contracted with independent contractors to perform certain of the items approved

by HUD and contained in the contract of February, 1971.

An administrative complaint was filed by the Nashville Tenants Organization with HUD seeking to have the approval for the modernization program withheld and the funds for its implementation frozen. This complaint was denied by HUD.

The modernization program was designed to upgrade housing projects which were constructed in the instant case prior to 1954. No tenants are being displaced. The purpose of tenant participation is to give tenants an opportunity to express their views and desires as to what items should be included in the modernization program so as to upgrade their living quarters and fairly distribute the benefits of modernization. In the instant case, the NHA conducted two surveys, one being very comprehensive. In addition to receiving questionnaires, the great majority of tenants were contacted personally by NHA representatives who discussed the various deficiencies in the housing units and who sought the tenants' preferences as to renovation priorities. The results of these surveys and complete information as to the method of conducting the surveys were submitted to HUD. Thereafter, as a result of discussion between HUD and NHA, the basic requirements such as roofing, rewiring, etc. were provided for in Phase One, with Phase Two to include the other items requested by the tenants.

■ Keeping in mind that HUD has not issued regulations defining tenant participation under the modernization program, having only used such general language as "involvement of the tenants in the plans and programs for the modernization of the project," and further realizing that HUD, after a complete examination of the surveys, determined that the tenants were properly involved in the program, this Court concludes that there was sufficient tenant involvement in formulating the modernization program. The tenants were contacted by questionnaires and personally by representatives of the housing authority. HUD, in the exercise of its supervisory duties, approved most of the fundamental repairs requested by the tenants and imposed no repairs which had not been requested by the tenants. In light of the above, the Court feels that it would be absurd to say that there was insufficient tenant participation in the determination of what basic and fundamental repairs were preferred and required by the tenants.

The plaintiffs asserted that HUD rules as to tenant participation in other programs such as urban renewal and model cities have recently been promulgated, and these rules are inferentially imposed on NHA and HUD in this particular instance. The plaintiffs maintain that this Court should use these regulations as a measuring stick in determining whether or not there was tenant participation in the present instance.

■ Of course the Court will not and cannot assume that regulations issued for one type of congressional program apply to another type of program. The Secretary must use his discretion in formulating regulations to fit the practical needs of each program. Therefore, no injunction will be issued based on the violation of regulations which have not been made applicable to the modernization program. Even assuming that these regulations provide a standard for judging tenant involvement, the Court finds that since the items contained in both Phase One and Phase Two were suggested by and implemented at the instance of the tenants of the project, these regulations were satisfied. Certainly no formal organization of tenants could have accomplished more. No applicable regulations have been violated by either NHA or HUD, and no injury of any kind has been inflicted upon or suffered by the tenants; therefore, the Court finds no merit in plaintiffs' contention that there was inadequate tenant participation.

## EMPLOYMENT BY LOCAL AUTHORITIES OF LOW-INCOME TENANTS

The second ground of contention of the plaintiffs' case involves the effects of 12 U.S.C. § 1701u on the modernization project. This statute is as follows:

"§ 1701u. Jobs in housing; employment opportunities for lower income persons in connection with assisted projects

"In the administration of the programs authorized by sections 1715z and 1715z–1 of this title, the below-market interest rate program under section 1715l(d)(3) of this title, the low-rent public housing program under the United States Housing Act of 1937, and the rent supplement program under section 101 of the Housing and Urban Development Act of 1965, the Secretary of Housing and Urban Development shall—

"(1) require, in consultation with the Secretary of Labor, that to the greatest extent feasible opportunities for training and employment arising in connection with the planning, construction, rehabilitation, and operation of housing assisted under such programs be given to lower income persons residing in the area of such housing; and

"(2) require, in consultation with the Administrator of the Small Business Administration, that to the greatest extent feasible contracts for work to be performed pursuant to such programs shall, where appropriate, be awarded to business concerns, including but not limited to individuals or firms doing business in the fields of design, architecture, building construction, rehabilitation, maintenance, or repair, located in or owned in substantial part by persons residing in the area of such housing."

To date there have been no regulations promulgated by the Department of Housing and Urban Development to implement the aforementioned act. However, in the contract entered into by HUD and NHA in February, 1971, a provision was inserted therein which was prepared by HUD and furnished to NHA as constituting HUD's attempt to comply with the conditional enactment. This amendment to the contract provides as follows:

"9. The Local Authority shall include or cause to be included in all contracts for construction, rehabilitation, or modernization work in connection with this project the following provisions:

"(1) If apprentices are employed in connection with this contract who were not employees of the contractor prior to the execution of this contract so as to be identified as regular employees of the contractor, the contractor agrees that priority shall be given in hiring practices to lower income applicants for employment residing in the area; PROVIDED that such priority shall be limited to those applicants whose income does not exceed the income limits for continued occupancy in Local Authority projects established by the Local Authority, and PROVIDED FURTHER that such applicants otherwise meet the requirements for apprenticeship existing in the community for the particular trade.

"(2) If common or skilled laborers are employed in connection with this contract who were not employees of the contractor prior to the execution of this contract so as to be identified as regular employees of the contractor, the contractor agrees that priority shall be given in hiring practices to lower income applicants for employment residing in the area PROVIDED that such priority shall be limited to those appli-

cants whose income does not exceed the income limits for continued occupancy in the Local Authority's projects established by the Local Authority.

"(3) And PROVIDED FURTHER that if the contractor has entered into an agreement with a union nothing herein shall be construed to interfere with such union agreement and such priorities of hiring may be limited to such lower income applicants as may be union members."

All of the work which has been performed under the contract between NHA and HUD for the modernization of the housing units in question has been performed by independent contractors who submitted bids in accordance with the applicable public bid procedures. The above section 9 was included in the bid information and is part of the contract executed by the subcontractors. Three subcontracts have been executed; one a roofing contract; another an electrical contract; and the third for Dempster Dumpsters. The housing authority itself has initiated or performed work only through public contract bidding arrangements. The proof indicates that two of the three contractors employed no extra help or employees, and that one contractor employed only one extra employee.

As to the other facets of the operation of the NHA, i. e., the operation of the housing units themselves, the housing authority has 64 tenants on its payroll, and five former tenants on its payroll who are presently managers of housing projects. (These former tenants were required to move out of the project when their income reached a maximum amount.) Tenants of the project are hired on a temporary basis for cleaning the apartments or housing units after a vacancy occurs and prior to the reletting of a unit. Both surveys conducted by the housing authority in connection with the modernization program were con-

ducted by tenants living in the projects. The NHA has made space available in the housing projects for community facilities and day-care centers. NHA has provided playground facilities and equipment for the children who reside in the project. The NHA encourages contractors to hire area residents when they are doing work in the project. The NHA has expressed a willingness to use tenants when feasible in all of its programs, including the modernization program.

The plaintiffs complain that the contracts issued to public contractors, after opening of bids, do not require the contractors to use the tenants of the public housing facilities. Furthermore, they complain that these contracts do not provide for training programs for apprentices. The proof shows that, as stated above, no regulations requiring such employment or apprenticeship training programs are now in existence. Furthermore, except for the employment of one individual, none of the contractors have employed any apprentices. In addition, an effort was made to reach some agreement in a conference between HUD and representatives of the local labor unions for such programs, but an agreement has not been reached as of this date.

The plaintiffs also assert that proposed regulations of HUD require that prospective bidders on contracts to be let by local housing authorities furnish certain information concerning the number of employees they expect to use on each job, the number of employees they anticipate hiring and the number of apprentices they can utilize, and any qualifications or skills that may be necessary in the particular field of the proposed contractor. Additional reports of this general nature are required after the contract is entered into between NHA and the contractor.

Even if such proposed regulations constitute a measuring stick, the Court fails to see that there has been any substan-

tial violation of said proposed regulations. Nor can this Court assume, once the new regulations are issued by the Secretary and become part of the contract between NHA and HUD, that NHA will not comply with its contract incorporating the regulations. Shannon v. HUD, 305 F.Supp. 205, 221 (E.D.Pa. 1969).

Therefore, this Court finds no merit in the contention that defendants violated 12 U.S.C. § 1701u or any regulation in the letting of the three contracts hereinbefore mentioned.

The foregoing holdings pretermit the questions as to: the contractual obligation of the local housing authority under 12 U.S.C. § 1701u; the review of the exercise of the discretion of the Secretary of HUD and HUD in the approval of this project; and the effect of plaintiffs' attempt to enjoin the expenditure of funds by an agency of the United States Government.

However, this Court can find no evidence in this record of arbitrary or capricious activities, findings or conclusions by HUD or an abuse of discretion by HUD. On the contrary, this Court feels that HUD in its discretion has exercised close supervision over the entire modernization program, both in its determinations prior to the approval of the program and by its insertion of the requisite provisions in the contract with NHA. In addition, this Court cannot find any evidence in this record of arbitrary or capricious activity on the part of the Nashville Housing Authority, nor any abuse of its discretion. It appears to the court, after hearing all the witnesses and observing their conduct and demeanor, that the Nashville Housing Authority has made every effort to comply with the requirements of the Department of Housing and Urban Development and the spirit of Congress in the enactment of its legislation, by providing for the wellbeing of its tenants.

Therefore, this case shall be dismissed, and an appropriate order will be entered.