Roger A. STEUP; American Federal Savings and Loan Association of Fort Wayne, Appellants (Plaintiffs below),

v.

INDIANA HOUSING FINANCE AUTHORITY; Robert D. Orr, John C. Hart, Jack New, James E. Faris, Carl Raymond Carlson, Louis H. Boink, and Frank P. Flynn as members of the Indiana Housing Finance Authority; and Theodore L. Sendak, as Attorney General of Indiana, Appellees (Defendants below).

No. 1179S309.

Supreme Court of Indiana.

April 2, 1980.

Lewis C. Bose and Kendall C. Crook, Bose & Evans, Indianapolis, for appellants.

Phillip E. Gutman and Richard H. Blaich, Rothberg, Gallmeyer, Fruechtenicht & Logan, Ft. Wayne, Harry T. Ice and James A. Shanahan, Ice, Miller, Donadio & Ryan, Indianapolis, for Indiana Housing et al.

Theodore L. Sendak, Atty. Gen., Jane M. Gootee, Deputy Atty. Gen., Indianapolis, amicus curiae.

HUNTER, Justice.

Appellants Steup and the American Federal Savings and Loan Association of Fort Wayne brought suit against the Indiana Housing Finance Authority (hereinafter referred to as "the Authority"), its individual members and the Attorney General of Indiana for a declaratory judgment and injunction holding unconstitutional the Indiana Housing Finance Authority Act, Ind.Code § 5–20–1–1, *et seq.*, (Burns Supp.1979), (hereinafter referred to as "the Act"). The Hancock Circuit Court held that the Act was a valid and constitutional enactment of the Indiana General Assembly. This Court granted a joint petition to transfer this cause from the Court of Appeals, pursuant to Ind.R.App.P. 4(A)(10).

Appellants' constitutional challenge raises the following issues for review:

(1) Whether the Act violates Ind.Const. Art. 10 § 5 by creating a state debt;

(2) Whether the Act (a) authorizes a pledge of the state's credit and (b) makes the state a stockholder in a corporation in violation of Ind.Const. Art. 11, § 12;

(3) Whether the Act authorizes the Authority to expend public funds for private benefit without a valid public purpose in violation of U.S.Const. amend. XIV and Ind.Const. Art. 1, §§ 1 and 21;

(4) Whether the Act grants some citizens privileges not granted others similarly situated in violation of U.S.Const. amend. XIV and Ind.Const. Art. 1, § 23;

(5) Whether the Act is arbitrary and in violation of equal protection guarantees, U.S.Const. amend. XIV and Ind.Const. Art. 1, § 23, by creating local employment and contracting privileges;

(6) Whether the Act creates tax exemptions contravening U.S.Const. amend. XIV and Ind.Const. Art. 1, § 23 and Art. 10, § 1;

(7) Whether the Act constitutes an improper delegation of legislative authority to a state agency in violation of U.S.Const. amend. XIV and Ind.Const. Art. 4, § 1 and Art. 1, § 23;

(8) Whether the Act denies due process to certain creditors of the Authority in violation of U.S.Const. amend. XIV and Ind. Const. Art. 1, §§ 1 and 21; and

(9) Whether the trial court's conclusions of law are contrary to law in that they are not supported by sufficient evidence and are contrary to the evidence.

■ A statute is clothed with a presumption of constitutionality. Every doubt raised must be resolved in favor of the statute's validity. Furthermore, a heavy burden is borne by the challenger. *Sidle v. Majors*, (1976) 264 Ind. 206, 341 N.E.2d 763.

## I.

■ Appellants first claim that the statute should fail because it authorizes the creation of state debt for purposes other than those permitted by Art. 10, § 5 of the Indiana Constitution which is as follows:

"No law shall authorize any debt to be contracted, on behalf of the State, except in the following cases: To meet casual deficits in the revenue; to pay the interest on the State Debt; to repel invasion, suppress insurrection, or, if hostilities be threatened, provide for the public defense."

The Authority is similar in nature to the commissions created for the construction of the Indiana Toll Road, *Ennis v. State Highway Commission*, (1952) 231 Ind. 311, 108 N.E.2d 687; the Indiana Toll Bridge, *Indiana State Toll Bridge Commission v. Minor*, (1957) 236 Ind. 193, 139 N.E.2d 445; the State Office Building, *Book v. State Office Bldg. Commission et al.*, (1957) 238 Ind. 120, 149 N.E.2d 273; and an Indiana port, *Orbison v. Welsh, Governor et al.*, (1961) 242 Ind. 385, 179 N.E.2d 727. The Authority is neither a state agency nor a private corporation.

"[I]t is a separate corporate entity which is an instrumentality or agency of the state although it is not the state in its sovereign corporate capacity." *Orbison v. Welsh, Governor, supra*, 242 Ind. at 399, 179 N.E.2d at 734.

Ind.Code § 5–20–1–16(a) (Burns Supp. 1979) provides that the Authority may create and establish one or more capital reserve funds to secure notes or bonds referred to and defined by Ind.Code § 5–20–1–2(10) (Burns Supp.1979) as "obligations." Ind.Code § 5–20–1–16(a) (Burns Supp.1979) states:

"The authority may [create] created and establish one [1] or more special funds, herein referred to as capital reserve funds, to secure the notes and bonds. The authority shall pay into each such capital reserve fund: (1) any moneys appropriated and made available by the state for the purposes of such fund; (2) any proceeds of sale of notes or bonds, to

the extent provided in the resolution of the authority authorizing the issuance thereof; and (3) any other moneys which may be made available to the authority for the purpose of such fund from any other source or sources."

Ind.Code § 5–20–1–16(b) (Burns Supp.1979) limits the usage of the funds, as follows:

"All moneys held in any capital reserve fund, except as otherwise specifically provided, shall be used, as required, solely: (1) for the payment of the principal of bonds of the authority secured in whole or in part by such fund; (2) for payment of the sinking fund payments mentioned in this section with respect to such bonds; (3) for the purchase or redemption of such bonds; (4) for the payment of interest on such bonds; or (5) for the payment of any redemption premium required to be paid when such bonds are redeemed prior to maturity. However, if moneys in such fund at any time are less than the capital reserve fund requirement established for such fund as provided in this section, the authority shall not use such moneys for any optional purchase or optional redemption of such bonds. Any income or interest earned by, or increment to, any capital reserve fund due to the investment thereof may be transferred by the authority to other funds or accounts of the authority to the extent such transfer does not reduce the amount of such capital reserve fund below the capital reserve fund requirement for such fund."

Appellants argue that appropriations made by the legislature and paid into the capital reserve fund would create a state indebtedness because those moneys could be applied directly and unconditionally to the satisfaction of the Authority's obligations. They further argue that the result would be identical if the state agreed directly to assume all or a portion of the obligations under the bonds or notes as they become due, which would be a violation of Art. 10, § 5 of the Indiana Constitution. Although the result may be identical:

"It is never an illegal evasion of a constitutional provision or prohibition to accomplish a desired result, which is lawful in itself, by discovering or following a legal way to do it." *Book v. State Office Bldg. Commission et al., supra,* 238 Ind. at 149, 149 N.E.2d at 288.

We have previously held that appropriations advanced to commissions for public purposes and projects did not create an indebtedness of the state. In prior cases, bonds authorized to be issued by the statute were not issued in the name of the state and, we held, were not its obligation. *Ennis v. State Highway Commission, supra; Indiana State Toll Bridge Commission v. Minor, supra; Orbison v. Welsh, Governor, supra; Book v. State Office Bldg. Commission, supra.* The Acts in *Ennis* and *Book* provided specifically that the bonds were payable solely from the revenues derived from the commissions. Both Acts contained a section stating that the obligations of the commissions were not the obligations of the state.

Similarly, Ind.Code § 5–20–1–8(a) (Burns Supp.1979) states in relevant part:

"The authority is hereby, authorized to issue bonds or notes, or a combination thereof, to carry out and effectuate its purposes and powers. The principal of, and the interest on, such bonds or notes shall be payable solely from the funds provided for such payment in this chapter."

Ind.Code § 5–20–1–7(a) (Burns Supp.1979) expressly states that the Authority's obligations do not constitute a debt, liability or obligation of the state:

"Obligations issued under the provisions of this chapter do not constitute a debt, liability or obligation of the state of Indiana or a pledge of the faith and credit of the state of Indiana, but shall be payable solely from the revenues or assets of the authority. Under any circumstances, general fund revenues of the state of Indiana may not be used to pay all or part of the obligations of the authority, and there is no moral obligation of the state of Indiana to pay all or part of the obligations of the authority. Each obligation issued under this chapter shall contain on the face thereof a statement to the effect that the authority shall not be obligated to pay the same nor the interest thereon except from the revenues or assets pledged therefor and that neither the faith and credit nor the taxing power of the state of Indiana is pledged to the payment of the principal of or the interest on such obligation."

The above provision leaves no recourse against the state and the general fund cannot be reached to pay the Authority's obligations.

Furthermore, the legislature *may* appropriate funds to the capital reserve fund. However, no funds can flow into the reserve fund unless and until there is an appropriation by the legislature. The Act allows but does not require such appropriations. In *Utah Housing Finance Agency v. Smart,* (1977) Utah, 561 P.2d 1052, 1056, the Utah Supreme Court stated:

"If the legislation requires future appropriations to defray the obligations of the Agency it would be invalid as lending the state's credit, but where, as here, it merely allows future appropriations without requiring such, it creates no binding obligation upon the state and therefore does not result in a debt of the state or the lending of the state's credit."

We hold that the Act does not create a state indebtedness and, therefore, does not contravene Ind.Const. Art. 10, § 5.

## II.

Ind.Const. Art. 11, § 12 provides in relevant part:

"nor shall the credit of the State ever be given, or loaned, in aid of any person, association or corporation; nor shall the State hereafter become a stockholder in any corporation or association."

### (a)

Appellants claim that the net effect of Sections 12, 16 and 23 of the Act, Ind.Code §§ 5–20–1–12, 16 and 23 (Burns Supp.1979),

is to loan the credit of the state to a corporation. We have held that this provision of the Constitution is applicable only to private corporations and not public bodies. *Orbison v. Welsh, Governor, supra* ; *Ennis v. State Highway Commission, supra.* We have determined above that the Authority is a "hybrid," "a separate corporate entity which is an instrumentality or agency of the state" but "not the state in its sovereign corporate capacity." *Orbison v. Welsh, Governor, supra,* 242 Ind. at 399, 179 N.E.2d at 734. Since the Authority is not a private corporation, we find no violation of the provision of Ind.Const. Art. 11, § 12 which prohibits the loaning of credit to private corporations.

(b)

■ Appellants also argue that the Act makes the state a stockholder in a corporation which is prohibited by Art. 11, § 12. Although appellants concede that the Act does not permit the Authority to own shares in any assisted corporation, they argue without citation to authority that the Authority's powers are equal to or exceed the typical powers of shareholders.

Ind.Code § 5–20–1–6 (Burns Supp.1979) states:

"(a) The articles of incorporation, association, partnership or other governing documents of any sponsor, builder or developer assisted under this chapter [5–20–1–1—5–20–1–26] shall contain, in addition to other requirements of law, statements:

"(1) that the entity has been organized to provide housing facilities and such social, recreational, commercial and community facilities as may be incidental or appurtenant thereto for persons or families of low and moderate income;

"(2) that the operations of the entity may be supervised by the authority and that the entity shall enter into such agreements with the authority as the authority from time to time requires, providing for regulation by the authority of the planning, development and management of any residential housing undertaken by the entity and their dis-

position of the property and franchises so long as the authority has a mortgage on the property; and

"(3) that the authority shall have the power to appoint to the board of directors of the entity a number of new directors, which number shall be sufficient to constitute a majority of the board, if the entity has received a loan or advance under this chapter and the authority determines that the loan or advances is [sic] in jeopardy of not being repaid, or that the residential housing for which the loan or advance was made is in jeopardy of not being constructed or rehabilitated.

"(b) The articles of incorporation, association, partnership or other governing documents of any limited dividend corporation, association or entity of any sponsor, builder or developer assisted under this chapter shall provide, in addition to other requirements of law, that every stockholder or member shall be deemed to have agreed that he shall not receive from the corporation, association or entity in repayment of his investment any sums in excess of the face value of the investment attributable to his respective interest plus cumulative dividend or surplus cash payments at such rate as the authority deems to be reasonable and proper."

These powers are extensive, but we need not reach a determination of whether Section 6 makes the Authority a shareholder in entities assisted under the Act. The Constitution prohibits the *state* from becoming a stockholder in a corporation. Again, the Authority is not the state in its sovereign capacity and, therefore, the Authority's relationships with other organizations do not contravene Ind.Const. Art. 11, § 12.

III.

■ Appellants claim that the Act authorizes expenditures of state funds for private benefit without a valid public purpose.

The Act was created for the express purpose of providing suitable housing for low and middle income Indiana residents. Ind.

Code § 5–20–1–1 (Burns Supp. 1979) defines the public purpose as follows:

"It is hereby declared: (1) that there exists in the state of Indiana a need for safe and sanitary residential housing within the financial means of low and moderate income persons and families, a need which unmet is a threat to the health, safety, morals and welfare of Indiana residents and which will require an excessive expenditure of public funds for the social problems thus created: (2) that private enterprise and investment will more adequately be able to produce the needed construction of decent, safe and sanitary residential housing at prices or rentals which persons and families of low and moderate income can afford, or to achieve the urgently needed rehabilitation of much of the present low and moderate income housing; that it is imperative that the supply of residential housing for persons and families of low and moderate income displaced by public actions or natural disaster be increased; and that private enterprise and investment be encouraged to sponsor, build and rehabilitate residential housing for such persons and families; (3) that the provision of decent, safe and sanitary housing for persons and families of low and moderate income who would otherwise be unable to obtain adequate housing at costs they could afford is a valid public purpose for which public money may be spent; and (4) that the necessity in the public interest and welfare for the provisions of this chapter [5–20–1–1—5–20–1–26] is hereby declared a matter of legislative determination."

Although the Act and the Authority will benefit private individuals, its general purpose is public in nature.

The standard of review to determine if the legislation is a valid exercise of police powers for a public purpose was set forth in *Department of Financial Institutions v. Holt*, (1952) 231 Ind. 293, 302, 108 N.E.2d 629, 634. The portion relevant to our consideration reads:

"If the law prohibits that which is harmless in itself, or if it is unreasonable and purely arbitrary, or requires that to be done which does not tend to promote the health, comfort, morality, safety or welfare of society, it is an unauthorized exercise of power."

In *Edwards v. Housing Authority of City of Muncie*, (1939) 215 Ind. 330, 335–7, 19 N.E.2d 741, 744, we stated:

"That the legislature has power to protect public health, safety, morals, and welfare, and to exercise and to authorize the exercising of the power of taxation and eminent domain, and the raising and expenditure of public funds for such purposes, cannot be doubted. . . . The facts found by the legislature and recited in the enactments are not disputed, or their existence denied, and, since the conditions described must be assumed to exist and to affect the public welfare, it can scarcely be doubted that there is a public interest which justifies the undertaking of the projects authorized by the enactments. . . . If such dwellings are a menace to the public, and their replacement necessary for the protection of the public, there is a sufficient basis for the expenditure of public funds. The amount, and manner, and method of the expenditure, unless it be shown to be entirely unreasonable, must be left to the legislative discretion.

\* \* \* \* \* \*

"The right to secure the benefits of such projects for the public generally cannot be denied because incidental special benefits may accrue to some individuals."

Public purposes are matters for legislative determination.

"It requires little evidence and less imagination to realize the effect upon communities and the state generally when housing is inadequate and substandard. The lack of adequate housing underlies many of the problems suffered by a state. . . All citizens are then called upon to bear the cost of combating the evils which are inevitable in the absence of good, adequate, clean, and financially possible housing. Nothing could be more of a public purpose.

\* \* \* \* \* \*

"How the funds are disbursed is not the critical issue, but rather whether the object for which it serves is a public purpose. The test is in the end result, not in the means. . . . A law may serve the public interest although it benefits certain individuals or classes more than others." *State ex rel. Douglas v. Nebraska Mortgage Finance Fund*, (1979) 204 Neb. 445, 283 N.W.2d 12, 21–2 [citations omitted].

The Nebraska Supreme Court held valid a statute similar to our Act under a constitution substantially identical to our own in this regard.

In addressing a like issue, the Utah Supreme Court stated:

"Appellants assert that the Act is constitutionally offensive because its operation will confer certain private benefits. There is an obvious private benefit to persons who are able to obtain housing financing through the Agency who would not have been able to obtain it elsewhere. There is a less substantial benefit to mortgage lenders who participate in the Agency's mortgage transactions. These benefits, however, are merely incidental to the dominant purpose of the Act to alleviate a serious statewide shortage of decent low and moderate income housing, with its consequent ill effects. While it is improper to spend public funds for private purposes, such private benefits incidental to a dominant public purpose do not detract from the constitutionality of the legislation." *Utah Housing Finance Agency v. Smart, supra,* 561 P.2d at 1054–55.

We believe the reasoning in *Utah Housing Finance Agency* to be sound and in harmony with our standards. Therefore we hold the purpose of the Act to be public in nature and to be a valid exercise of the legislative police power. Furthermore, the benefits received by private individuals are incidental to the execution of the legitimate public purpose.

### IV.

Appellants assert that many moderate income persons eligible for assistance under the Act can afford housing at prices substantially above the average local housing cost. Families with incomes in excess of 125% of the median family income for a geographical area are not provided assistance under the Act. Appellants claim that, therefore, the Act violates U.S.Const. amend. XIV and Ind.Const. Art. 1, § 23 by granting privileges and immunities to certain Indiana citizens while denying the same privileges and immunities to other citizens similarly situated.

When classifications are drawn according to some fundamentally suspect classification, such as race, the Fourteenth Amendment places a heavy burden of justification upon the state. However, classifications drawn according to income are not suspect.

"In . . . cases, involving distinctions not drawn according to race, the [United States Supreme] Court has merely asked whether there is any rational foundation for the discriminations, and has *deferred to the wisdom of the state legislatures.*" *Loving v. Virginia,* (1967) 388 U.S. 1, 9, 87 S.Ct. 1817, 1822, 18 L.Ed.2d 1010, 1016 [emphasis added].

"It is unnecessary to say that the 'equal protection of the laws' required by the 14th Amendment does not prevent the states from resorting to classification for the purposes of legislation. Numerous and familiar decisions of this court establish that they have a wide range of discretion in that regard. But the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia,* (1920) 253 U.S. 412, 415, 40 S.Ct. 560, 561–2, 64 L.Ed. 989, 990–1.

Under Article 1, § 23 of the Indiana Constitution,

"a classification, to be valid, must be based on substantial distinctions which make one class so different from another as to suggest the necessity for different

legislation with respect thereto." *Davis Construction Co. v. Board of Commissioners,* (1921) 192 Ind. 144, 150, 132 N.E. 629, 631.

■ In the interest of most effectively accomplishing a public purpose, legislation may necessarily confer benefits on some persons which are not available to others. But the equal protection clause of our United States Constitution has never prevented the Indiana General Assembly from indulging in reasonable classifications. *Indiana & Michigan Elec. Co. v. City of Anderson,* (1978) Ind.App., 376 N.E.2d 114.

"The power of the legislature is not without limitations but, necessarily, this power must have a wide range of discretion. There is no precise rule of reasonableness of classification, and the rule of equality permits many practical inequalities. A classification having some reasonable basis is not to be condemned merely because it is not framed with such mathematical nicety as to include all within the reason of the classification and to exclude all others. Exact exclusion and inclusion is impractical in legislation. It is almost impossible to provide for every exceptional and imaginary case and a legislature ought not to be required to do so at the risk of having its legislation declared void, even though appropriate and proper as applied to the general subject upon which the law is intended to operate." *Cincinnati, Hamilton and Dayton R. Co. v. McCullom* (1915) 183 Ind. 556, 561, 109 N.E. 206, 208.

■ Applying these standards, we find that the 125% of median income demarcation line is neither arbitrary nor unreasonable in light of the purpose of the Act. The Act does not grant privileges and immunities to certain citizens to the exclusion of others similarly situated.

## V.

■ Appellants raise an equal protection challenge to Section 5 of the Act. Ind.Code § 5–20–1–5 (Burns Supp.1979) reads in relevant part:

"(a) in the administration of the programs authorized by or receiving benefits under section 4 [5–20–1–4] of this chapter, the executive director of the authority shall require:

"(1) that to the extent feasible opportunities for training and employment arising in connection with the planning, construction, rehabilitation, and operation of housing assisted under such programs shall be given to persons of low income residing in the area of such housing; and

"(2) that to the extent feasible contracts for work to be performed pursuant to such programs shall be awarded to business concerns, including but not limited to individuals or firms doing business in the fields of design, architecture, building construction, rehabilitation, maintenance or repair, located in, or owned in substantial part by persons of low income residing in the area of such housing."

Appellants claim that the legislature has created employment and contracting preferences which are classifications that cannot stand up to equal protection scrutiny.

We will apply here the same level of scrutiny which we applied in Issue IV above. Again, no suspect classification is involved. Our statute does not establish racial quotas and is, therefore, wholly dissimilar to the Local Public Works Capital Development and Investment Act of 1976, as amended by the Public Works Employment Act of 1977 [1] which currently troubles

1. "Except to the extent that the Secretary determines otherwise, no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term 'mi-

nority business enterprise' means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-

the federal courts.[2] In fact, Section 5 of our Act does not involve a mandatory quota at all. The Act includes an important modifying phrase, "to the extent feasible." This statutory language requires every positive approach that can properly be taken to award contracts to local firms and employ low income individuals in planning projects and in the construction, maintenance and renovations, where necessary, of housing units. The federal housing statute[3] which requires employment of low income persons and local business "to the *greatest* extent feasible" has been interpreted in this manner. 40 A.L.R.Fed. 842. The Department of Housing and Urban Development has couched its regulations under 12 U.S.C.A. 1701u (Supp.1980) in terms of "good faith effort." 24 C.F.R. §§ 135.55–.60. A discretionary good faith requirement is certainly within the purview of the public purpose to be served in our Act. The statute remains directory. The Housing Finance Authority and contractors are not free to ignore the statute and their discretion is limited by it. In construing the language of the federal statute, the Ninth Circuit Court of Appeals has held:

> "This is strong language. It does not give the City officials the 'broad discretion' that the trial court concluded that it does. We think that 'greatest extent' means what it says, the maximum, and that the defendants were therefore obliged to take every affirmative action that they could properly take to make the award to Ramirez." *Ramirez, Leal & Co. v. City Demonstration Agency,* (9th Cir. 1976) 549 F.2d 97, 105.

The requirement is not impracticable or overly burdensome. We do not have a legislative history in regard to Ind.Code § 5–20–1–5 (Burns Supp.1979). However, since our statute follows the federal statute virtually verbatim, we deem it proper to look to the history of the federal statute. The legislative history of the federal act reveals that thought was given to practicality.

> "The Banking and Currency Committee felt that the provision did not require that a contractor moving into a neighborhood with an already established coterie of foremen and key workers disband his

speaking, Orientals, Indians, Eskimos, and Aleuts." 42 U.S.C.A. § 6705(f)(2) (Supp.1979).

2. 42 U.S.C.A. § 6705(f)(2) has been held unconstitutional in *Montana Contractors' Association v. Secretary of Commerce,* (D.Mont.1978) 460 F.Supp. 1174; *Associated General Contractors of California v. Secretary of Commerce,* (C.D. Cal.1978) 459 F.Supp. 766; *Wright Farms Construction, Inc. v. Kreps,* (D.Vt.1977) 444 F.Supp. 1023; *Associated General Contractors of California v. Secretary of Commerce,* (C.D. Cal.1977) 441 F.Supp. 955. The statute has survived equal protection challenges in other courts. *Fullilove v. Kreps,* (2d Cir. 1978) 584 F.2d 600; *Ohio Contractors Association v. Economic Development Administration,* (S.D.Ohio 1977) 452 F.Supp. 1013; *Rhode Island Chapter, Associated General Contractors v. Kreps,* (D.R. I.1978) 450 F.Supp. 338; *Constructors Association of Western Pennsylvania v. Kreps,* (W.D. Pa.1977) 441 F.Supp. 936. The United States Supreme Court has granted *certiorari* in *Fullilove v. Kreps, supra,* at 441 U.S. 960, 99 S.Ct. 2403, 60 L.Ed.2d 1064.

3. 12 U.S.C.A. § 1701u (Supp.1980), enacted as part of the Housing and Urban Development Act of 1968, reads substantially the same as our Ind.Code § 5–20–1–5 (Burns Supp.1979): "In the administration by the Secretary of Housing and Urban Development of programs providing direct financial assistance, including community development block grants under title 1 of the Housing and Community Development Act of 1974, in aid of housing, urban planning, development, redevelopment, or renewal, public or community facilities, and new community development, the Secretary shall—
> "(1) require, in consultation with the Secretary of Labor, that to the greatest extent feasible opportunities for training and employment arising in connection with the planning and carrying out of any project assisted under any such program be given to lower income persons residing in the area of such project; and
> "(2) require, in consultation with the Administrator of the Small Business Administration, that to the greatest extent feasible contracts for work to be performed in connection with any such project be awarded to business concerns, including but not limited to individuals or firms doing business in the field of planning, consulting, design, architecture, building construction, rehabilitation, maintenance, or repair, which are located in or owned in substantial part by persons residing in the area of such project."
The constitutionality of this statute has not been challenged in the federal courts.

organization by replacing them with local workers or local contractors. However, to the extent that outside workers and subcontractors were needed, they should be hired, if at all possible, from persons or business establishments in the area. *Senate Report (Banking and Currency Committee) No. 91–392, Sept. 5, 1969 (91st Cong. 1st sess.).*" 40 A.L.R.Fed. 842. For a judicial concurrence in this regard, see *Drake v. Crouch,* (M.D.Tenn.1971) 377 F.Supp. 722. In that case three subcontractors were involved and between them only one additional individual was hired. But the court found:

"that the Nashville Housing Authority has made every effort to comply with the requirements of the Department of Housing and Urban Development and the spirit of Congress in the enactment of its legislation, by providing for the wellbeing of its tenants." 377 F.Supp. at 729.

Quotas and racial classifications aside, we must now turn to equal protection analysis under the "fair and substantial relation" test. Appellants cite some Indiana cases in which statutes did not pass this constitutional scrutiny, *Davis Construction Company v. Board of Commissioners, supra,* (wartime statute relieving highway contractors who contracted with boards of commissioners under certain provisions of one designated statute out of many acts which provide for highway and other public construction); *Crawford v. Calumet Paving Company,* (1954) 233 Ind. 127, 117 N.E.2d 368 (statute granting immunity to contractors constructing highways under contract with the state highway commission to the exclusion of contractors repairing or resurfacing highways or building or repairing bridges under contract with the commission or contractors constructing or repairing local roads); and *State ex rel. Miller v. McDonald,* (1973) 260 Ind. 565, 297 N.E.2d 826 (city ordinance declaring apartment houses of four or fewer units eligible for city refuse pickup but not apartment houses of five or more units). In these cases, this Court did not question the purposes of the acts in question, only the rationality of the relation between those purposes and the distinctions or classifications drawn.

The purpose of the Indiana State Housing Finance Authority Act is to provide affordable housing to low and moderate income persons and families. Ind.Code § 5–20–1–1 (Burns Supp.1979). Appellants argue that the provisions of Ind.Code § 5–20–1–5 (Burns Supp.1979), which create employment and contracting preferences in favor of low income individuals and businesses owned by low income individuals located in the area of the housing being constructed or rehabilitated under the Act, are not rationally related to the purpose of the Act. We do not agree.

Rentals and prices which low and moderate income persons and families can afford can be achieved in three ways: lowering rents and prices, supplementing income, or doing both until the desired medium is reached. This Act attempts the third alternative with respect to low income individuals by creating the above employment and contracting preferences. Appellants argue that Section 5 improperly distinguishes between low income persons and families and moderate income persons and families in light of the statutory purpose to aid both. It stands to reason that moderate income families come closer to being able to afford adequate housing than do those in the low income category. To the extent that this statute might aid low income persons in moving into or closer to the moderate income group it is consistent with the general public purpose served by this act within our body politic.

It is self-evident that the stability of low and moderate income housing is served by the promotion of economic conditions in the neighborhood, particularly the employment of residents and stimulation of local businesses. Furthermore, resident participation in a program is more apt to foster such intangibles as responsibility and pride than are distant bureaucratic or corporate control and execution of the program. See Ind.Code § 5–20–1–5(b) (Burns Supp.1979). This is analogous to the federal hiring preference afforded Indians in the Indian ser-

vice. Refusing to characterize the preferences as racial, the Supreme Court stated:

"Rather, it is an employment criterion reasonably designed to further the cause of Indian self-government and to make the [Bureau of Indian Affairs] more responsive to the needs of its constituent groups. It is directed to participation by the governed in the governing agency." *Morton v. Mancari*, (1974) 417 U.S. 535, 554, 94 S.Ct. 2474, 2484, 41 L.Ed.2d 290, 302.

In providing that preferences should be given to individuals of low income and local businesses operated by individuals of low income, the legislature evidently considered that the interest of such persons and businesses in a project in their own locality would positively affect the quality of the development. Certainly those located within the area of the Authority's operation would be more concerned with enhancement of the value of the development to the community than those located outside the area. Therefore, the preferences expressed are reasonable in that they may work to maximize the quality of the assisted housing under this Act. The preferences stated do not operate to deprive certain individuals and businesses within the classifications drawn of the opportunity to participate in the Authority's programs. Quite to the contrary. The Authority's operations are statewide and these preferences will be employed in each of many areas in which the Authority will operate. Thus, Section 5 of the Act operates to allow maximum participation rather than repeated use of a few individuals or businesses statewide. There is nothing arbitrary or unreasonable in the preferences indicated for low income persons and businesses. Objections to this section of the Act indicate dissatisfaction with the policy of the Act rather than its constitutional validity.

"The mere fact that all of our citizens are unable, for various and diverse reasons, directly or indirectly, to participate in and negotiate for some part of a proposed public development or enterprise, appears to be but a lame excuse for seeking a declaratory judgment that the proposal is constitutionally invalid." *Hawkins v. City of Greenfield*, (1967) 248 Ind. 593, 612, 230 N.E.2d 396, 407.

The provisions of Ind.Code § 5–20–1–5 (Burns Supp.1979) do bear a fair and substantial relation to the object of Article 20, Chapter 1. Appellants claim that Section 5 of the Act is not related to the goals of the Act which are "restricted solely to the accelerated production of adequate housing." Even accepting this overly simplistic statement of the object of the legislation, we cannot agree with appellants' position which assumes that the purpose of Section 5 is to provide employment. See the United States District Court's construction of the federal statute, 12 U.S.C.A. § 1701u (Supp. 1980), in *Feliciano v. Romney*, (S.D.N.Y. 1973) 363 F.Supp. 656. We have found that the general purpose of the statute, providing adequate, affordable housing for low and moderate income individuals and families, is constitutional. Therefore, it is simply not logical to strike down a provision which is devised to enhance the economic conditions of the same group of low income persons. We hold that Ind.Code § 5–20–1–5 (Burns Supp.1979) comports with the equal protection guarantees of U.S.Const. amend. XIV and Ind.Const. Art. 1, § 23.

### VI.

◼ Appellants also argue that the Act provides for tax exemptions, in violation of Ind.Const. Art. 10, § 1, U.S.Const. amend. XIV and Ind.Const. Art. 1, § 23.

Article 10, § 1 of the Indiana Constitution reads in part:

"(a) The General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to secure a just valuation for taxation of all property, both real and personal. The General Assembly may exempt from property taxation any property in any of the following classes:

"(1) Property being used for municipal, education, literary, scientific, religious or charitable purposes; . . . ."

Ind.Code § 5–20–1–21 (Burns Supp.1979) states:

"The authority shall not be required to pay any taxes and assessments to the state, or any county, municipality or other governmental subdivision of the state, upon any of its property or upon its obligations or other evidences of indebtedness pursuant to the provisions of this chapter, or upon any moneys, funds, revenues or other income held or received by the authority, and the notes and bonds of the authority and the income therefrom shall at all times be exempt from taxation imposed by the state, except for death and gift taxes and taxes on transfers. Real property owned by the authority shall be exempt from all property taxation and special assessments of the state or political subdivisions thereof, but the authority may agree to pay, in lieu of such taxes, such amounts as the authority finds consistent with the cost to the state or political subdivision of supplying municipal services for such real property and any housing development constructed thereon, which payments such bodies are authorized to accept."

The appellants, citing *Chadwick v. City of Crawfordsville*, (1940) 216 Ind. 399, 24 N.E.2d 937, argue that the exemption for property used for "municipal purposes" relates solely to the purpose for which the property is used and that the purpose must be "public." However, in *Orbison v. Welsh, Governor, supra*, we stated:

"It is unquestioned that the exception contained in the above constitutional provision specifying an exemption from taxation '. . . for municipal . . . purposes, as may be specially exempted by law' has been construed to include public or governmental purpose as distinguished from private. *City of Louisville v. Babb* (C.C.1935), 75 F.2d 162, 166, cert. den. 295 U.S. 738, 55 S.Ct. 650, 79 L.Ed. 1686." 242 Ind. at 408–09, 179 N.E.2d 738–39.

We have similarly held tax exemptions valid in *Edwards v. Housing Authority of City of Muncie, supra*, and *Ennis v. State Highway Commission, supra*. In *Ennis* we stated:

"Since we have found this not to be a private corporation, this contention is without merit." 231 Ind. at 329, 108 N.E.2d at 696.

Having determined that the Authority is not a private corporation, but a state instrumentality operating for a legitimate public purpose, we hold that the tax exemption is not a violation of Art. 10, § 1 of the Indiana Constitution.

The appellants' argument that the Act confers a privilege of tax exemption to bondholders while denying the privilege to holders of bonds issued by private for-profit or not-for-profit corporations is without merit. The Act does not create a classification of bondholders. Any distinction lies in the character of the bond itself. Given our determination that bonds issued by the Authority in furtherance of the public purpose are properly exempted from taxation, there is no violation of Art. 1, § 23 of the Indiana Constitution or the Fourteenth Amendment to the United States Constitution.

## VII.

Appellants also claim that the Act constitutes an improper delegation of legislative power by the General Assembly to the Authority in violation of Art. 4, § 1 of the Indiana Constitution which states in part:

"The Legislative authority of the State shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."

This provision has been construed to mean that although the legislature cannot delegate the power to make a law, it can make a law delegating power to an agency "to determine the existence of some fact or situation upon which the law is intended to operate." *Edwards v. Housing Authority of City of Muncie, supra*, 215 Ind. at 339, 19 N.E.2d at 746. Reasonable standards are necessarily imposed when the legislature delegates discretionary duties to administrative boards and officers. *Ennis v. State Highway Commission, supra*. In *Matthews*

*v. State*, (1958) 237 Ind. 677, 681–2, 148 N.E.2d 334, 336, we stated:

"[T]he policy of the Legislature and the standards to guide the administrative agency may be laid down in very broad and general terms. Such terms get precision from the knowledge and experience of [persons] whose duty it is to administer the statutes, and then such statutes become reasonably certain guides in carrying out the will and intent of the Legislature. *Mutual Film Corp. v. Ohio Indus'l Comm.* (1915), 236 U.S. 230, 245, 35 S.Ct. 387, 391, 59 L.Ed. 552, 560; 42 Am.Jur., Public Administrative Law, § 45, p. 346."

The appellants argue that the Act does not sufficiently define certain terms, including "low and moderate income families," "adjusted family income," "geographical area" and "area of residence," or outline standards to be used by the Authority in its various capacities. The appellant relies on *Schakel v. Review Board of Indiana Employment Security Div.*, (1968) 142 Ind.App. 475, 235 N.E.2d 497. The Appellate Court of Indiana held unconstitutional part of the Indiana Employment Security Act which authorized the director to waive the statutory periodic registration requirement upon an individual's showing of good cause. The Court declared the provision unconstitutional because there was no clear definition of good cause. The Appellate Court relied on *State ex rel. Standard Oil Co. v. Review Bd.*, (1951) 230 Ind. 1, 10, 101 N.E.2d 60, 64:

"The attempted delegation of authority involves more than methods or details. It permits to the Board such a wide discretion as to vest in them the power not only to find the facts, but to make the law which shall be applied to those facts. The range of the Board's discretion as to what constitutes 'good cause' might vary from claim to claim and from day to day, and in the final analysis depend largely, if not entirely, on the changing complexion of the Board itself, for 'good cause' might mean one thing to one mind and something entirely different to another."

This case is distinguishable from *Schakel v. Review Board of Indiana Employment Security Div., supra.* Section 2(11) of the Act grants the Authority the power to establish the standards to be used in determining those persons of low and moderate income. Furthermore, the provision guides the Authority in the formation of the standards and defines low and moderate income families with adequate specificity as the case necessitates. *Ennis v. State Highway Commission, supra.* Ind.Code § 5–20–1–2(11) (Burns Supp.1979) provides:

"(11) 'Persons and families of low and moderate income' means persons and families of insufficient personal or family income to afford adequate housing as determined by the standards established by the authority, and in determining such standards the authority shall take into account the following:

"(i) the amount of total income of such persons and families available for housing needs;

"(ii) the size of the family;

"(iii) the cost and condition of housing facilities available in the different geographic areas of the state; and

"(iv) the ability of such persons and families to compete successfully in the private housing market and to pay the amounts at which private enterprise is providing sanitary, decent and safe housing; except that in the case of federally subsidized mortgages with respect to which income limits have been established by any agency of the federal government having jurisdiction thereover for the purpose of defining eligibility of low and moderate income persons and families, the limits so established by such federal agency shall govern; . . . .."

Other terms about which the appellant complains are broad and general and will gain precision from the Authority. *Matthews v. State, supra.* They involve methods and details that are well placed in the Authority's discretion.

■ Ind.Code § 5–20–1–9 (Burns Supp. 1979) provides that the Authority may enter into trust agreements with certain corporate trustees. The Authority has discre-

tion to include certain provisions in the trust agreements or resolutions. But these provisions must be "for protecting and enforcing the rights and remedies of the holders of any [obligations issued under the provisions of the Act] as may [be] reasonable and proper and not in violation of law" or "as the Authority may deem reasonable and proper for the security of the holders of any obligations." These guidelines are sufficiently specific. Therefore, Section 9 of the Act does not improperly delegate legislative power to the Authority.

■ The appellants next claim that Section 17 of the Act divests the General Assembly of the power to legislate for the preservation of public health, safety and morals in violation of Art. 1, § 23 and Art. 4, § 1 of the Indiana Constitution. Ind. Code § 5–20–1–17 (Burns Supp.1979) reads as follows:

> "The state may at any time, or from time to time, alter or change the structure, organization programs, activities or powers of the authority and may, at its sole discretion, terminate the existence of the authority. However, the state pledges and agrees with the holders of any obligations issued pursuant to this chapter that the state will not limit or alter the rights vested in the authority to fulfill the terms of any agreements made with the holders thereof, or in any way impair the right and remedy of the holders until the notes or bonds, together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of such holders are fully met and discharged. The authority is authorized to include this pledge and agreement of the state in any agreement with the holders of such notes or bonds."

The Supreme Court of Pennsylvania upheld a similar statutory provision of the Housing Finance Agency Law in *Johnson v. Pa. Housing Finance Agency*, (1973) 453 Pa. 329, 309 A.2d 528. That Court found the covenanting provision constitutional, stating:

> "The challenged provision is nothing more than an amplification of the Federal and State constitutional prohibition against the impairment of contracts." 453 Pa. at 345, 309 A.2d at 537.

We agree with the interpretation in *Johnson, supra*. Ind.Code § 5–20–1–17 (Burns Supp.1979) does not divest the General Assembly of the power to legislate for the welfare of the citizens of Indiana. The Act allows the State to reconsider and alter the functions, structure and power of the Authority while pledging that the rights of bondholders will remain unscathed if changes are made. The Act, consistent with the constitutional prohibition against the impairment of contracts, solely prohibits the General Assembly from affecting the contractual rights of bondholders.

Appellants argue that even if Section 17 is not an unconstitutional delegation of legislative power, it nevertheless contravenes constitutional equal protection provisions. Section 17 provides that the state shall not "limit or alter the rights vested in the authority to fulfill the terms of any agreements" with its bondholders or "in any way impair" the rights and remedies of the bondholders. Appellants contend that these provisions extend privileges to the Authority's bondholders which are not available to security holders in general. However, in this regard, Section 17 is merely a statutory recitation of Ind.Const. Art. 1, § 24 which provides that the legislature may not pass a law impairing the obligations of contracts, a provision applicable to all security holders.

### VIII.

■ Appellants claim that the Act denies due process of law to certain classes of creditors and claimants of the Authority by enabling the Authority to pledge any of its assets or revenues to the payment of principal or premium, if any, and interest on obligations of the Authority. This power, it is claimed, will result in preference of bondholders over all other creditors or claimants of the Authority without prior notice to affected parties or any further action by the Authority. Ind.Code § 5–20–1–10 (Burns Supp.1979) provides:

"The pledge of any assets or revenues of the authority to the payment of the principal of, premium, if any, and interest on any obligations of the authority shall be valid and binding from the time when the pledge is made, and any such assets or revenues shall immediately be subject to the lien of such pledge without any physical delivery thereof or further act. The lien of any such pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the authority, irrespective of whether such parties have notice thereof."

Since the Act states that such a pledge will be "valid and binding from the time when the pledge is made" it is clear that the pledge only applies to future revenues or existing unpledged assets. The statute does not enable the Authority to give priority liens to bondholders on assets which are already subject to mechanics' liens, judgment liens or any other type of secured claim. Only general creditors, who are on notice of the provisions of the Act authorizing the pledge, may be affected by the Authority's exercise of this power.

Appellants argue that the express elimination of any duty on the part of the Authority to notify all parties who might have a claim against the Authority when the Authority exercises its power under Section 10 of the Act effectively denies certain creditors and claimants due process of law. In support of this proposition, appellants rely on *Fuentes v. Shevin*, (1972) 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556. *Fuentes* narrowly held that the provisions of a statute authorizing prejudgment replevin of a chattel from the possessor by a creditor without notice and a hearing was a deprivation of property without due process of law. *Fuentes* involved an adhesion contract in a consumer credit transaction, where the parties were of unequal bargaining strength.

*Fuentes* does not support appellants' argument. General creditors of the Authority are not in the same position as the consumer debtor in *Fuentes*. Here, those who deal with the Authority are chargeable with knowledge of the statute and are forewarned of the Authority's power to create liens in favor of bondholders. Potential creditors and claimants must conduct their business relations with the Authority accordingly. Therefore, we hold that Ind. Code § 5–20–1–10 (Burns Supp.1979) does not deny due process of law to creditors and claimants of the Authority.

## IX.

Appellants also claim that the trial court's conclusions of law are not supported by sufficient evidence and are contrary to uncontroverted evidence. We reiterate that the appellants have a heavy burden to establish invalidating facts in a constitutional attack on a statute. The law is clear that:

"a statute is presumptively valid and will not be overthrown as unconstitutional if it can be sustained on any reasonable basis. . . ." *Book v. State Office Bldg. Commission et al., supra*, 238 Ind. at 133, 149 N.E.2d at 280.

Appellants cannot attack a negative decision on the ground that there was a lack of evidence to sustain the judgment. *Ott v. Johnson*, (1974) 262 Ind. 548, 319 N.E.2d 622. The evidence which appellants claim mandates conclusions of law contrary to the trial court's findings is of no moment given our determination that the benefits derived by private individuals are incidental to the furtherance of a legitimate public purpose.

The Indiana Housing Finance Authority Act serves a most legitimate state purpose: providing general access to safe and sanitary housing. All distinctions and classifications are drawn according to income, the most relevant factor in housing during times of spiraling inflation and high interest rates. The legislature provided investment incentives so that private enterprise can further the purposes of the Act, building and rehabilitating housing for low and moderate income families. This legislative effort comports with both the Indiana and United States Constitutions.

For the foregoing reasons there was no trial court error and the judgment of the Hancock Circuit Court should be affirmed.

Judgment affirmed.

DeBRULER and PRENTICE, JJ., concur.

GIVAN, C. J., concurs in part, dissents in part, with opinion in which PIVARNIK, J., concurs.

GIVAN, Chief Justice, concurring in part; dissenting in part.

I respectfully dissent to the majority opinion that upholds the constitutionality of IC § 5–20–1–5. The appellant argues that section 5 creates a preferential class, *i. e.* low income businesses in the area and low income persons who might be employed in either construction or maintenance in connection with the project. Financial status has not joined race, alienage and religious persuasion in the ranks of suspect classes requiring a strict level of scrutiny. Examining the statute with a lower level of scrutiny, I fail to see a rational relationship between the classification and the purpose of the statute.

The express purpose of the statute is to provide suitable housing for low and moderate income families based on the legislatively determined need for such housing. IC § 5–20–1–1. The purpose and needs so stated are not to increase employment opportunities or enhance the financial status of low income businesses nor provide supplemental income to families who may be so employed.

The United States District Court in Vermont in *Wright Farms Const., Inc. v. Kreps*, (1977) 444 F.Supp. 1023, addressed itself to a situation wherein a plaintiff brought an action to restrain the Secretary of Commerce from enforcing 42 U.S.C. 6705(f)(2), the Minority Business Enterprise provision of the Local Public Works Capital Development and Investment Act of 1976, as amended by the Public Works Employment Act of 1977. The act in question addressed itself to the potential for racial discrimination in the letting of public contracts. However, in discussing the acts pertinent in that case, the court held that no discrimination was involved or established and that the application of the act to the established facts was unconstitutional. In so holding, the court pointed out that there had been no legislative finding of discrimination in the construction industry in the State of Vermont and for that reason the court had to determine whether or not the imposition of the racial quota was constitutional when applied to the circumstances of the cases. The court therefore held that the plaintiffs were denied equal protection under the Fifth Amendment of the United States Constitution when they were denied contracts because they were a corporation wholly owned by two Caucasians and thus had no representative of a minority as required under the statute. Thus, even though a statute would purport to address itself to a discrimination problem, the operation of that statute must be open to all equally situated in the absence of a showing of discrimination. I would therefore hold that the provisions in IC § 5–20–1–5, requiring preferential treatment to certain individuals and businesses, are unconstitutional.

PIVARNIK, J., concurs.